Peter CAMARATA and Jack C.
Vlahovic, Plaintiffs,

v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS OF
AMERICA, Frank E. Fitzsimmons, Indi-
vidually and as General President there-
of, Ray Schoessling, General Secretary-
Treasurer thereof, John Doe and Mary
Moe (fictitious names), Individually and
as editors of International Teamster,
Defendants.

Civ. A. No. 78–1588.

United States District Court,
District of Columbia.

Sept. 24, 1979.

Craig H. Livingston and Margaret M. Hayden, Ball, Hayden, Kiernan & Livingston, Newark, N. J., Michael Krinsky, Rabinowitz, Boudin & Standard, New York City, David Rein, Rein, Drew, Garfinkle & Dranitzke, Washington, D. C., local counsel, for plaintiffs.

Robert M. Baptiste, Washington, D. C., for Intern. Broth. of Teamsters.

Barry M. Levine, Washington, D. C., for Fitzsimmons & Schoessling.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

JOHN H. PRATT, District Judge.

1. This is an action under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401, *et seq.*, for a declaratory judgment that a union publication has discriminated in favor of and against certain candidates in violation of §§ 401(c) and 501(a) of the Act and for injunctive relief to prohibit future violations and to require the union publication to carry in future issues articles which publicize plaintiffs' political activities. In a memorandum opinion dated December 12, 1978, plaintiffs' claim under § 501(a) was dismissed. An evidentiary hearing on the remaining claim was held on March 12–14, 1979.

### The Parties

2. Plaintiff Peter Camarata is currently a member in good standing of Teamsters, Truck Drivers Local Union 299, Detroit, Michigan. Plaintiff Jack Vlahovic is currently a member in good standing of Teamsters, Building Material, Construction and Fuel Drivers Local Union 213, Vancouver, British Columbia, Canada. Both local unions are affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter, International Union). Both plaintiffs are members of the Teamsters for a Democratic Union (TDU). In early June, 1978, plaintiff Camarata announced his intention to run for the office of general president of the International Union and plaintiff Vlahovic announced his intention to run for the office of general secretary-treasurer of the International Union at the next convention of the International Union which will be conducted in June of 1981.

3. Camarata has never been elected to any office in any affiliated teamster organization nor has he ever been employed on a full or part-time basis by any teamster entity. Camarata ran for the office of vice-president of the Local Union 299 in December, 1977 and finished third in the voting out of four candidates. He has never held any official position with any teamster affiliate. Camarata has been a member and officer of TDU since its inception in September, 1976.

4. Vlahovic does not presently hold any official position with any teamster affiliate nor has he held such a position at any time since September, 1977. In 1976, Vlahovic was elected to the office of secretary-treasurer of Local Union 213, a position he held from January 11, 1977 through September 21, 1977. Prior to his election, Vlahovic had served Local 213 for approximately six years as an appointed business agent. Vlahovic has been a member of TDU since late June or early July, 1977.

5. Defendant International Union is a "labor organization" as defined by § 3(i) of the LMRDA, 29 U.S.C. § 402(i), with its principal place of business located in the District of Columbia. As such, the International Union must conduct periodic elections of officers, as prescribed by Title IV of the Act, 29 U.S.C. § 481 *et seq.* The International Union is governed by a constitution, the current edition of which was adopted by the duly-elected delegates to the last International Convention held during the period June 14–17, 1976.

6. Defendants Frank E. Fitzsimmons and Ray Schoessling are the general president and general secretary-treasurer, respectively, of the International Union and, as such, are "officers" within the meaning of § 3(n) of the Act, 29 U.S.C. § 402(n). Each was elected to a five-year term of office by the duly-elected delegates to the International Union's 1976 convention. They are the principal executive officers of the International Union. (Constitution, Articles VI and VII).

*Election Procedures*

7. Pursuant to Article IV, Section 2(d) of the Constitution, nominations and an election will be held to fill the offices of general president and general secretary-treasurer, as well as the remaining sixteen (16) positions on the International Union's general executive board and three (3) trustees, at the next convention scheduled to be conducted during June, 1981. Candidates for International Union office will be nominated at the convention and elected by delegates who have been elected by the members of affiliated bodies in accordance with the provisions of Article III, Section 5 of the International Constitution.

8. Local unions affiliated with the International Union are entitled to send a specified number of delegates to the Convention based upon the average membership of the local union over a two-year period. (Constitution, Article III, Section 2). The number of delegates to which a local union is entitled is determined at the time of the Call for the Convention, issued by the general secretary-treasurer no less than ninety (90) calendar days prior to the convening of the convention (Constitution, Article III, Section 1).

9. Local union officers and business agents who have been elected by secret ballot vote of the membership of their local union are potential delegates to any convention which may take place during their term of office (Constitution, Article III, Section 5(a)(1)). Officers and business agents elected in local unions located in the United States are generally elected to serve a three-year term of office. (Constitution, Article XXII, Section 3(a)). Officers and business agents elected in local unions located in Canada may have a term of office up to five years in length. (Constitution, Article XXII, Section 3(a)). Local union officers are usually elected on the basis of their familiarity with local problems and to provide day-to-day representation for the members of that union.

10. If, at the time of the Call for the Convention, a local union is entitled to a number of delegates in excess of the total number of elected officers and elected business agents, the local must conduct a secret ballot election to select additional delegates. Elections for the purpose of selecting additional delegates must be conducted in the same manner as are elections of local union officers and must comply with the requirements of Title IV of the Act. Elections to select additional delegates must be conducted during the period immediately prior to the convening of the convention. (Constitution, Article III, Section 5). Candidates for positions as delegates sometimes run on

platforms committed to positions on national union matters which may be considered at the convention.

11. Each local union affiliated with the International Union is governed by a seven member executive board comprised of officers elected by secret ballot vote in accordance with the requirements of Title IV. (Constitution, Article XXII, Section 2(a)). Each local union must adopt its own bylaws in which the local's principal officer must be specifically designated. (Constitution, Article XXII, Section 1).

12. In the event a local union is advised, at the time of the Call for the Convention, that it is entitled to fewer delegates than the total number of elected officers and elected business agents, then the principal officer of the local union has first priority to serve as a delegate. (Constitution, Article III, Section 5(a)(2)). If the local union is entitled to send delegates in addition to the principal officer, or if the principal officer elects not to attend the convention, then the local union's executive board shall designate from among the remaining elected officers and elected business agents who shall attend the convention. (Constitution, Article III, Section 5(a)(2)).

13. The number of delegates any local union will be entitled to send to the 1981 convention cannot be determined at this time or at any time prior to the Call for the Convention. Nor can the identity of any delegate from any individual local union be determined at this time. However, local union officers and business agents elected by secret ballot vote during 1978, 1979 and 1980, provided their terms of office expire after June, 1981, and provided that they are still in office at that time, are potential delegates to the 1981 convention.

14. Candidates for any office on the general executive board of the International Union or for the offices of International Trustee must be nominated during the sessions of the convention. (Constitution, Article IV, Section 2). There are no other requirements for nomination. Candidates need not be delegates or alternate delegates to the convention or even be present at the convention. Candidates seeking office in the International Union must have been in continuous good standing status in an affiliated local union during the twenty-four (24) consecutive months prior to the month in which the convention is convened and must have been continuously employed at the craft within the International Union's jurisdiction during the same period of time. (Constitution, Article II, Section 4(a)(1), (2) and (3)). Good standing status requires payment of monthly dues on or before the last business day of the current month. (Constitution, Article X, Section 5(c)). Nominees must accept nomination at the time made, either in person or, if absent, in writing. (Constitution, Article IV, Section 2).

15. The twenty-four (24) month period, within which a prospective candidate seeking election to an International Union office at the 1981 convention must maintain continuous good standing and employment at the craft, does not begin until June 1, 1979 and will expire on May 31, 1981. Accordingly, the eligibility of plaintiffs as candidates for office in the defendant International Union cannot be determined before the first day of June, 1981. There is, however, nothing in the union constitution or bylaws which prevented them from announcing their candidacy at any time.

*The International Teamster*

16. The official publication of the International Union is the *International Teamster* (hereinafter *I.T.*), a monthly magazine mailed to each of the union's approximately 2.3 million members. From August, 1961 through June, 1978, issues of the *I.T.* were published under the direction of Wellington Allen Biggs (hereinafter Biggs). Since the July, 1978 issue, the *I.T.* has been published under the supervision of Carl Fritz Zeller (hereinafter Zeller). Zeller began his employment with the International Union on June 1, 1978, having been hired in early May, 1978.

17. At all relevant times, the *I.T.* consisted of thirty-two pages of text and a cover, a total of thirty-six pages of printed

material. Authority to supervise the magazine staff is vested in the general president of the International Union (Fitzsimmons) who must, in turn, comply with the policies of the general executive board. (Constitution, Article VI, Section 7). When Zeller was hired, he was advised by Fitzsimmons that the magazine should be streamlined, its layout modernized to make it more readable, and its coverage of local union matters increased. To accomplish these objectives, Zeller instituted changes in the magazine's format. Beginning with the July, 1978 issue, he exercised his editorial discretion to decrease the number of pictures of the International Union's officers, instituted separate sections devoted to coverage of news emanating from affiliated local unions, eliminated several traditional feature items, e. g., a joke page, and experimented with various cover designs.

18. As a result of the changes in editorial style, since July, 1978, the number of pictures of Fitzsimmons and Schoessling and the number of times their names have appeared in the magazine have decreased in comparison to the number of pictures and names appearing in issues published prior to July, 1978. Statistics provided by plaintiffs reveal that the name "Frank E. Fitzsimmons" appeared in the magazines published during the period April, 1977 through June, 1978 an average of 34.71 times per issue and Fitzsimmons' picture appeared an average of 8.2 times per issue. However, during the period July, 1978 through January, 1979, the name appeared an average of 15.14 times per issue while the picture appeared only 3.43 times per issue. Comparable figures for Ray Schoessling show about 12.4 times per issue pre-July, 1978 and 6.0 times per issue from July, 1978 through January, 1979. Schoessling's picture appeared 3.81 times per issue and 3.00 times per issue during the respective periods. Since February, 1979, the pictures and names of Fitzsimmons and Schoessling have appeared less frequently. See defendants' supplement exhibits 1A–1F. These references, if originally overdone and somewhat tasteless, are the typical coverage of the activities of the principal officers of an organization in its "house organ." The dosage of "pablum and puffery" is not too dissimilar to that contained in corporate reports to stockholders. Because the executive officers' activities reflect the position of their organization, they in the nature of things will be participants in matters of importance to the membership and will get more publicity than anybody else as a matter of course.

19. At no time was Zeller instructed, directed, or otherwise ordered by either Fitzsimmons or Schoessling, or by any other person acting at their direction, to make changes in the magazine's new format designed to decrease the coverage of either Fitzsimmons or Schoessling. Neither Zeller nor Biggs has ever received any direction from anyone to utilize the I.T. to promote the candidacy of either Fitzsimmons of Schoessling or to discriminate against the candidacy of any individual.

20. During the relevant period, the I.T. staff has included between 2 and 4 writers. The majority of the articles appearing in any issue of the I.T. are written by the members of the magazine's staff or by members of the International Union's staff employed in other departments. Sources for the articles include government publications, materials submitted by members and affiliated local unions, press releases and news items appearing in the commercial press. The members of the magazine staff travel to conferences and meetings conducted by various union entities and report thereon. Such travel assignments during the period in question were made by either Biggs or Zeller. Decisions concerning the content of the magazines published since April, 1977 were made exclusively by Biggs until June, 1978, and thereafter by Zeller.

21. Since the 1930's the I.T. has carried a "General President's" column which has discussed matters of current interest to the membership. All issues of the I.T. published since April, 1977 have contained such a column appearing over Fitzsimmons' signature. During this period, among the matters with which the column has dealt have been contract negotiations, organizing campaigns, union pension funds, the energy cri-

sis and its effect on the various crafts at which teamster members work, the state of the nation's economy, the legislative efforts to reform the National Labor Relations Act, and the various proposals to deregulate the trucking industry.

22. All of the columns referred to above, and all other "General President's" columns printed during the period were written, over Fitzsimmons' name, by Biggs until June, 1978 and thereafter by Zeller. Neither editor discussed the topic of the monthly column with Fitzsimmons before it was written. Nor was a draft submitted in advance for Fitzsimmons' approval of the style or content. Fitzsimmons first saw the "General President's" column after the entire issue of the magazine had been reduced to final page proofs, the last step prior to the magazine's publication. Fitzsimmons never changed the content or style of the "General President's" column after his review of the final page proof.

23. In addition to reviewing the "General President's" column, Fitzsimmons also routinely reviewed the contents of the entire magazine. Usually, the final page proofs were submitted to Fitzsimmons on the morning of the last Friday of the month. Fitzsimmons returned the final page proofs later that day or, on occasion, on the following Monday when the magazine was normally sent to the printer. Fitzsimmons never made any substantive changes in the content or layout of the magazine although he reviewed the final page proofs.

24. While Fitzsimmons routinely reviewed the final page proofs of each issue of the *I.T.* and occasionally submitted news items for the consideration of Biggs and, most recently, Zeller, decisions as to the articles and pictures included in the magazines published since April, 1977 were made by Biggs until June, 1978, and thereafter by Zeller. Schoessling never reviewed the magazine prior to its publication and never submitted articles for the consideration of Biggs or Zeller, and, other than on one occasion when he was asked to verify a procedure utilized by his office, played no role in the publication of the *I.T.* during the relevant period.

25. The testimony of Biggs and Zeller established that they had the complete responsibility of supervising the researching, writing, and compilation of the magazine. They decided what articles to include, selected accompanying photographs, approved headlines and layout, and personally wrote the column bearing Fitzsimmons' name. Both performed these tasks without receiving instructions from Fitzsimmons or Schoessling as to the materials to be included or excluded from the magazine. Neither Biggs nor Zeller submitted articles, pictures or the "General President's column to Fitzsimmons before the magazine was prepared in final page proof form. Neither discussed articles or the content of the "General President's" column with Fitzsimmons prior to the preparation of the final page proofs. Neither submitted final page proofs to or discussed the content of the magazine with Schoessling. During the relevant period, Fitzsimmons never made any substantive changes in the final page proofs of either the "General President's" column or the remainder of the magazine.

26. In March, 1977, it was announced that Fitzsimmons would resign from his position as a trustee of the Central States, Southeast and Southwest Areas Pension Fund (hereinafter Central States Pension Fund). The administration of this particular Fund had long been a matter of controversy extensively reported in the various news media. This resignation resulted in an outbreak of speculation, widely reported, that Fitzsimmons would also shortly resign from the office of general president of the International Union, a position to which he had been elected only eight months earlier. The possibility of Fitzsimmons' imminent resignation was widely discussed during March, 1977 by members of the International Union, including dissident teamster members who belonged to TDU. As part of his duties, Biggs repeatedly advised reporters that Fitzsimmons did not intend to resign from the office of general president but the news reports of his impending resignation and the rumors to that effect continued.

27. In the April, 1977 issue of *I.T.*, Biggs, included in the "General President's" column the statement that "I not only will serve out my term, but will be a candidate for reelection in 1981." As was customary, the column appeared over Fitzsimmons' signature. Biggs wrote the column without prior discussion with Fitzsimmons. Fitzsimmons had not previously told Biggs that he would be a candidate for reelection in 1981. However, Biggs was aware that Fitzsimmons had issued a statement to the news media in Chicago, on March 16, 1977, denying that he was going to resign from the office of general president and stating that he would be a candidate for reelection in 1981. Fitzsimmons first saw the column when it was submitted to him in final page proof form along with the remainder of the magazine. The evidence does not establish that Schoessling ever announced his intention to be a candidate for reelection at the 1981 convention.

28. Biggs concluded that his prior efforts to put an end to the rumors of Fitzsimmons' impending resignation had been unsuccessful and, therefore, he decided to add to the routine denial of imminent resignation in the April, 1977 "General President's" column, that Fitzsimmons intended to be a candidate for reelection for emphasis. Biggs further testified that he believed that a more emphatic denial had to be issued because the effect of the persistent rumors would be, in his view, to erode the collective bargaining and organizational strength of the International Union.

29. Despite the statement in the April, 1977 issue of the *I.T.*, the rumors concerning the imminent resignation of Fitzsimmons from the office of General President persisted and were reported in the media throughout 1977 and early 1978.

30. Fitzsimmons and Schoessling, as the two principal executive officers of the International Union, routinely receive coverage in the *I.T.* in connection with their active participation in issues of importance to the union's membership.

31. Neither Camarata nor Vlahovic has ever submitted an article concerning any of his activities within the union to the *I.T.* Neither of them has ever advised the *I.T.*, in advance, of any union-related activity in which he planned to be a participant so that coverage of his activities could be arranged. Nor have they reported their participation in any union-related event after the fact. No newsworthy union activities of plaintiffs were deliberately excluded from coverage in the *I.T.*

32. On June 9, 1978, counsel for plaintiffs wrote to the General Executive Board demanding that the next issue of the *I.T.* include an article announcing plaintiffs' candidacies. Schoessling responded on June 12, 1978, on behalf of the General Executive Board, and advised that the matter would be considered by the General Executive Board at its next regularly scheduled meeting in mid-July, 1978. By letter dated August 4, 1978, plaintiffs' counsel was notified that an announcement would be carried in the August, 1978 issue of the *I.T.* and counsel was provided with the text of the announcement at that time.

33. The August, 1978 issue of the *I.T.* included on page 28 a column containing an announcement, previously approved by the General Executive Board, of the candidacies of Camarata and Vlahovic. The announcement was submitted to the *I.T.* by defendant union's general counsel. Neither Camarata nor Vlahovic had submitted an announcement to the *I.T.* for inclusion in any issue of the magazine. Nor did either plaintiff submit a picture to the *I.T.*

34. Zeller was responsible for the publication of the August, 1978 issue and was personally responsible for the placement of the announcement of the Camarata and Vlahovic candidacies. Zeller included it in the regional news section of the magazine in a box and printed in bold type. Zeller made the decision to print the announcement as submitted and, as a matter of editorial style, decided not to put a headline on the column. All of the decisions regarding the placement of the announcement were made by Zeller, without consultation with either Fitzsimmons or Schoessling. The announcement did not appear in the

July, 1978 issue because all of the space in that issue had previously been allotted, including a pre-determined amount of space reserved for the prepared statement on inflation to be delivered at a press conference on June 23, 1978.

35. Since Zeller became the editor in June of 1978, by coincidence, the same month that the plaintiffs announced their candidacy the *I.T.* has not contained any reference to anyone's intention to be a candidate at the 1981 convention, with the sole exception of the plaintiffs' announcement in the August, 1978 issue. During the same period, the *I.T.* has likewise not contained any reference to "dissidents."

### The Camarata and Vlahovic Candidacies

36. TDU was founded in September, 1976. One of its originally stated purposes was to have the views of minority factions within the union included in the *I.T.* The TDU was also dedicated to achieving direct election of officers of the International Union, rather than the present system of election by delegates at a convention. TDU viewed "the courts and government agencies as one tool among many that is to be used   .   .   ." to achieve these and other stated goals.

37. The official publication of the TDU is a newspaper entitled *Convoy*. Approximately ten issues are printed each year by members of the TDU staff.

38. At the TDU convention held in September, 1977, consideration was given to instituting a lawsuit to secure a court-ordered membership referendum type of election for International Union officers. At the time, the leadership of TDU was convinced that Fitzsimmons would resign before the expiration of his term of office in 1981. One issue of *Convoy* reported:

He [Fitzsimmons] recently announced that not only would he not resign, but that he would run again in 1981. This is pure bluff. There is little likelihood that he will run in 1981 and there is a real possibility that he will be gone before the next union convention four years away.

The correspondence, memoranda, and issues of the *Convoy* published through December, 1977 reveal that the TDU leadership wanted to obtain through litigation a court-ordered membership referendum election of officers.

39. During the latter part of 1977, TDU's attorneys advised their clients that a suit to obtain a referendum election of international officers would not have a great chance of succeeding. However, the attorneys advised that a suit could be brought which would permit TDU to mail its program to every member of the union.

40. At the January, 1978 meeting of the TDU Steering Committee, the governing body of that organization, it was reported that Fitzsimmons' impending resignation would provide TDU with a number of options, among which was the possibility of filing a lawsuit for " 'equal time' in Teamster publications."

41. In February, 1978, the members of the TDU Steering Committee were advised that work on the "equal time" suit was in progress, but that the suit could not be filed until a candidate for the office of general president was selected. On March 2, 1978, the Steering Committee was advised that the "equal space" suit was "in limbo pending the determination of the Steering Committee as to who should be the TDU candidate for International President to oppose Fitzsimmons or whoever else might be running." The Steering Committee was informed that the suit was "an opportunity for TDU to get its position across to the over two million teamsters in this country." Counsel strongly urged the Steering Committee to select a candidate.

42. At the March, 1978 Steering meeting, it was reported that the "lawsuit for 'equal time' was ready to go, but TDU had to come up with its candidate for General President." The Committee adopted a four part motion to (1) pursue the court suit for "equal time;" (2) designate Camarata as the TDU candidate for general president; (3) designate Jack Vlahovic as the TDU candidate for general secretary-treasurer; and (4) designate Doug Allan as the alter-

nate candidate for general secretary-treasurer in the event Vlahovic declined.

43. Vlahovic did not accept the designation as the TDU candidate for general secretary-treasurer until after May 28, 1978. Before accepting, Vlahovic first obtained a commitment that he would not incur any of the costs of the "equal time" lawsuit, which were being borne by TDU and other non-teamster contributors.

44. On June 4, 1978, Vlahovic had issued on his own behalf a "General News Release" in Vancouver, British Columbia, identifying Vlahovic as the "deposed" secretary-treasurer of Teamsters Local 213 and announcing that "he [Vlahovic] has decided to put his name in the ring at the next Teamsters International Convention in 1981" for the office of general secretary-treasurer and that "his running mate will probably be Pete Camarata, who evidently will try to unseat General President Frank Fitzsimmons . . . ." Vlahovic did not submit a copy of his release to the *I.T.*

45. On June 6, 1978, Camarata, while on a TDU sponsored trip to Washington, D.C., announced his candidacy to a number of reporters. No written statement regarding his candidacy was issued until June 8 and Camarata did not send a copy of that release to the *I.T.*

46. On June 23, 1978, Camarata held a press conference on the steps of the International Union's headquarters in Washington, D.C., at which he again announced his candidacy. The conference was scheduled to begin one hour prior to a previously scheduled press conference at which Fitzsimmons was to deliver a statement of the Union's position on inflation. No advance notice of Camarata's conference was given to the *I.T.* nor did Camarata send copies of the materials distributed to the press to the *I.T.* after the completion of his conference. TDU paid for Camarata's expenses in connection with the press conference.

47. Since June 23, 1978, Camarata has traveled in the United States and Canada on behalf of TDU at TDU expense. Camarata concedes that his candidacy is based upon the TDU platform and that it is impossible to distinguish between his activities as a TDU officer and his candidacy. Camarata seeks access to the *I.T.* to further his campaign for general president and in the interests of TDU.

48. Since June 23, 1978, Vlahovic's travels, with the exception of his attendance at the TDU convention in October, have been limited to British Columbia. His activities have been limited to distributing copies of *Convoy*. Vlahovic seeks access to the *I.T.* to advance his candidacy.

49. Both Camarata and Vlahovic are committed to proselytizing on behalf of TDU. Neither has significantly increased his activities promoting TDU since June 23, 1978, nor have they altered the type of activities in which they are involved. The vast majority of their activities are in connection with the TDU-sponsored events designed to recruit new members, activities identical to those in which they were involved before their candidacies were announced. In short, their political activities are primarily designed toward creating an atmosphere whereby TDU will attract attention and members and thereby be able to present formidable opposition to the present management of the defendant union.

50. The focus of the plaintiffs' political campaign reflects the primary interest of TDU. TDU's long-standing goal has been to gain access to the *I.T.* Only after being advised by its lawyers that said goal might be achieved by designating candidates for International Union office did the TDU consider that alternative. No complaints about the content of the *I.T.* were made prior to that time. TDU discounted the likelihood that Fitzsimmons would serve the remainder of his current term of office, let alone be a candidate in 1981, as late as January, 1978.

51. The types of events which plaintiffs propose be included in the *I.T.* are essentially to publicize TDU activities. Plaintiffs apparently claim that TDU should be entitled to space in the *I.T.* without regard to whether its candidates are engaged in newsworthy activities of interest to teamster members nationally.

## CONCLUSIONS OF LAW

1. The enforcement mechanism of Title IV, LMRDA, is set forth in the provisions of 29 U.S.C. § 482, which vests the Secretary of Labor with exclusive authority to enforce violations of Title IV through post-election proceedings. The provisions of § 482 are supplemented by 29 U.S.C. § 483, which provides that the rights and remedies existing independent of the LMRDA remain in full force and effect with the exception that the remedies of § 482 are exclusive with respect to actions challenging an election already conducted. *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964).

██ 2. The single exception to the exclusive enforcement power of the Secretary is found in 29 U.S.C. § 481(c). This section provides that "bona fide" candidates for union office may, prior to an election, bring private enforcement actions with respect to certain pre-election conduct. *Calhoon v. Harvey, supra,* at 140, 85 S.Ct. 292. Such conduct, however, must bear upon one of the guarantees of § 481(c). The provisions of § 481(c) are not an open invitation to union members to challenge any union practices which may reflect upon the elective process, but are to be narrowly construed in accordance with the congressional intent to minimize judicial interference in union elections. In this regard, a complaining union member must be a "bona fide" candidate, seeking to challenge union conduct proscribed by § 481(c), regarding a specific election in which such candidate has been nominated or is legitimately seeking nomination. *Murphy v. Operating Engineers, Local 18*, 99 L.R.R.M. 2074, 2120–21 (N.D. Ohio 1978).

3. Congress explicitly intended to limit the jurisdiction of the federal judiciary over complaints alleging a violation of § 401(c) to suits filed by a "bona fide" candidate. 105 Cong.Rec. 6728 (1959).

██ 4. Regardless of whether their dedication to the growth and development of TDU as a strong voice of dissent motivated them to become candidates, plaintiffs are "bona fide" candidates, as required by § 401(c) of the LMRDA, 29 U.S.C. § 481(c). We therefore have jurisdiction.

██ 5. Duly elected union officials have a right and a responsibility to exercise the powers of their office and to advise and report to the membership on issues of general concern. In accordance with this responsibility, elected union officials are entitled to use union publications to express their views and to have their union activities reported in said publications. They are not ordinarily required to give space therein to the expression of contrary views. *Murphy v. Operating Engineers, Local 18, supra,* at 2122. It is a fine line as to when the coverage of the newsworthy activities of an incumbent official by a union publication becomes so excessive column-wise or pictorially in relation to the other matters covered by the publication so as to render it campaign literature on behalf of the incumbent. *Yablonski v. UMW*, 305 F.Supp. 868 (D.D.C.1969). So long as such coverage is addressed to the regular functions, policies and activities of such incumbents as officers involved in matters of interest to the membership, and not as candidates for re-election, there is no violation of § 401(c). *New Watch-Dog Committee v. New York City Taxi Drivers Union*, 438 F.Supp. 1242 (S.D. N.Y.1977); *Sheldon v. O'Callaghan*, 335 F.Supp. 325 (S.D.N.Y.1971) *aff'd*, 538 F.2d 313 (2d Cir. 1976).

██ 6. The issues of the *I.T.* published during the period April, 1977 through August, 1979 do not discriminate in favor of or against any candidate for office in the International Union's 1981 election and are not campaign literature in the statutory sense. 29 U.S.C. § 481(c).

(a) The issues of the *I.T.* presently before the Court were not published at a time proximate to the election as to which relief is sought by plaintiffs. *Hodgson v. UMW*, 344 F.Supp. 17 (D.D.C.1972); *Hodgson v. Liquor Salesmen's Union, Local No. 2*, 334 F.Supp. 1369 (S.D.N.Y.1971), *aff'd* 444 F.2d 1344 (2d Cir. 1971).

(b) Neither plaintiff was attacked either directly or indirectly in any issue of the *I.T.* *Sheldon v. O'Callaghan, supra* at 325.

(c) Neither plaintiff holds an official position with the international union or with an affiliated organization which would merit coverage in the *I.T.* *Yablonski v. UMW, supra* at 868.

(d) The plaintiffs have not participated in any newsworthy, non-political activities which merit coverage in the *I.T.* *Hodgson v. UMW, supra* at 17.

(e) The few references to "dissidents" in the *I.T.* appear randomly throughout the various issues, and coincide with events rather than elections. At times, months lie between such comments.

(f) The *I.T.* does not evidence a consistent concentrated practice of undue and excessive coverage of incumbent officers, and denigration of dissidents, as to cross that fine line which distinguishes proper reporting of union activities from re-election campaigning by defendant incumbents. *Murphy v. Operating Engineers, Local 18, supra,* at 2123. The facts herein are completely distinguishable from those in *Yablonski, supra.*

7. Defendants have not been requested by plaintiffs to distribute by mail or otherwise at plaintiffs' expense campaign literature in aid of plaintiffs' candidacies to all members in good standing.

8. Since the *I.T.* is not campaign literature, defendants through the publication of the *I.T.* have not discriminated in favor or against any candidate with respect to the use of membership lists.

9. The plaintiffs have failed to meet the burden of establishing that injunctive relief is warranted and have failed to meet the criteria for granting such relief. *U. S. v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

10. The relief requested by plaintiffs, *i. e.,* the nationwide mailing at union expense of plaintiffs' campaign literature

and the inclusion of such literature on the basis of equal space and prominence in future issues of the *I.T.,* is beyond the authority of this court to grant, would compel the International Union to violate § 401(g) of the LMRDA, 29 U.S.C. § 481(g), and would infringe upon the union's First Amendment rights. *Yablonski v. UMW, supra* at 868; *Yablonski v. UMW,* 307 F.Supp. 1226 (D.D.C.1969); *Sheldon v. O'Callaghan, supra* at 328; *Hodgson v. Liquor Salesmen's Union, Local No. 2, supra* at 1377.

An order consistent with the foregoing has been entered this day.