797 F.2d 140
 123 L.R.R.M. (BNA) 2606, 104 Lab.Cas. P 11,925
 Raymond J. DONOVAN, Secretary of Labor, United States
Department of Labor
v.
METROPOLITAN DISTRICT COUNCIL OF CARPENTERS, United
Brotherhood of Carpenters and Joiners of America, AFL-CIO.
Appeal of William E. BROCK, Secretary of Labor, United
States Department of Labor.
 No. 85-1670.
 United States Court of Appeals,
Third Circuit.
 Argued June 18, 1986.
Decided August 1, 1986.
 
 Edward T. Ellis (argued), Helene Boetticher, Counsel for Litigation, Susan M. Webman, Asst. Counsel, George R. Salem, Deputy Sol., John F. Depenbrook, Associate Sol., Donald G. Shalhoub, Deputy Associate Sol., U.S. Dept. of Labor, Washington, D.C., for appellant.
 Thomas W. Jennings (argued), William J. Einhorn, Sagot & Jennings, Philadelphia, Pa., for appellee.
 Before SEITZ, HUNTER, and MANSMANN, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 The Secretary of Labor (Secretary) brought this action under Title IV of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. Secs. 481 et seq. (the Act), alleging violations of the Act in the course of an election for the presidency of appellee Metropolitan District Council (the Council). After a two-day bench trial, the district court made findings of fact and conclusions of law and entered judgment for the Council. The Secretary appealed. We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 I.
 
 2
 The Secretary brought this action in response to a complaint by the losing candidate in the election, John McCloskey. The Secretary's complaint alleged two violations of section 401 of the Act, 29 U.S.C. Sec. 481: the Council's failure to comply with McCloskey's reasonable requests to distribute campaign literature to members at his own expense, in violation of 29 U.S.C. Sec. 481(c); and the use of Council money to promote the candidacy of the incumbent president, Edward Coryell, in violation of 29 U.S.C. Sec. 481(g). The latter violation allegedly consisted of distributing to Council members two sets of minutes containing statements unfavorable to McCloskey, and a subsequent "correction" to one set of minutes containing further statements harmful to McCloskey. The Secretary unsuccessfully sought to have the district court declare the election void and order a new election under the Secretary's supervision.
 
 
 3
 The Council is an intermediate labor organization and the governing body for fourteen carpenters' union locals in the Philadelphia area. It consists of a President, a Secretary-Treasurer, and a number of business agents and local union representatives, all elected triennially. The election at issue occurred in June 1984. Both candidates--the incumbent, Coryell, and the challenger, McCloskey--announced their candidacies in mid- to late 1983 and began active campaigning in December of that year. A third candidate, not involved in this litigation, also participated.
 
 
 4
 The Council establishes election procedures for each election based on recommendations of the presidents of the local unions. On January 26, 1984, the local presidents met with Coryell and recommended a schedule for the upcoming election, which was approved at the next Council meeting on February 16. One of these rules provided:
 
 
 5
 Any announced candidate (upon proper request) will be eligible for authorized mailing labels for mailing literature after April 15, 1984. There will be no limit on the number of mailing labels allowed for candidates.
 
 
 6
 Mailing labels, containing the names and addresses of the members of the Council's constituent local unions, were necessary if a candidate wished to reach voters by mail, since the Council's membership list is normally kept confidential. The district court found that the rule was properly adopted and applied in a non-discriminatory manner, but that permitting candidates access to the list earlier than April 15th would not have interfered with the conduct of the District Council's business. Nevertheless, pursuant to the rule, McCloskey's request for mailing labels in February was denied.
 
 
 7
 Despite being denied access to the official membership list, McCloskey had, in the fall of 1983, managed to procure an unauthorized, but apparently official, membership list from another source.[1] He delivered this list to a printer to be entered into a computer for the purpose of producing mailing labels. In January 1984, several union officials, including Coryell, apprised of the situation, went to the printer's offices and seized the list. This action led to a lawsuit by McCloskey seeking to have the list returned; judgment was entered for the defendants on February 13, 1984. McCloskey's delivery of the list to the printer also resulted in internal union charges being lodged against him. The upshot of these charges was that McCloskey was suspended from union activities for three years; pursuant to union rules, however, this suspension did not affect his candidacy in the ongoing election.
 
 
 8
 McCloskey's recently-terminated lawsuit was the subject of a report by one of the District Council's business agents, Michael Dooley, at the February 16 meeting of the District Council. Reports by business agents were a regular feature of District Council meetings, which were open only to Council officers and representatives. Among other things, Dooley stated (correctly) that the printer to whom McCloskey had delivered the union's membership list ran a non-union bulk-mailing operation. The minutes of the meeting, however, reported that Dooley had stated that the printer was non-union; in fact, however, the printing operation was unionized, although the bulk-mailing operation was not. The erroneous minutes, prepared at union expense, were distributed to each of the local unions making up the district council, in accordance with regular practice.
 
 
 9
 McCloskey demanded that the minutes be corrected, and a correction was duly prepared by the Secretary-Treasurer. The "corrected" transcript of Dooley's remarks was substantially more detailed than the original version. At the direction of Coryell, and without the Secretary-Treasurer's knowledge, the correction was distributed with an attached letter from one Lavine, the president of a printer's union (the Lavine letter). The Lavine letter stated that the printer to whom McCloskey had delivered the membership list ran a non-union bulk-mailing operation. It also stated that the union label on McCloskey's campaign literature was fraudulent, and that the literature had been photocopied rather than printed.
 
 
 10
 The last incident complained of occurred at the Council's March 1984 meeting. At that meeting George Walish, a member of the executive board of the International, presented a report, a substantial portion of which was in rebuttal to allegations made in some of McCloskey's campaign literature. The literature asserted that the District Council, under Coryell's leadership, had made a gift of $13,490 to Walish. Speaking at the March meeting, Walish claimed that the "gift" was merely money received from a testimonial dinner given in his honor (and therefore was not Council funds); Walish also claimed that he had donated most of the money to charity. Walish went on to state that McCloskey's statements were libelous, and he threatened to bring internal union charges against McCloskey. The substance of Walish's remarks (as edited by Walish himself) was reprinted in the minutes of the meeting, which were distributed in the usual manner.
 
 
 11
 Coryell defeated McCloskey in the election by a vote of 2,828 to 2,684.II.
 
 
 12
 Section 401(c) of the Act, 29 U.S.C. Sec. 481(c), reads in relevant part:
 
 
 13
 Every national or international labor organization, ... and every local labor organization, and its officers, shall be under a duty ... to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization.
 
 
 14
 (Emphasis added.) The Secretary contends on appeal that the district court erred in focusing on the reasonableness of the District Council's rule governing requests to distribute literature, rather than on the reasonableness of the request itself. In the Secretary's view, compliance with a candidate's request is required whenever the request is made "during the campaign period" and compliance is not "logistically impossible." Br. at 17. The Secretary also argues that in any event the District Council's April 15th deadline was unreasonable.
 
 
 15
 The parties disagree about our scope of review of the district court's determination that McCloskey's requests to mail campaign literature were unreasonable. It perhaps goes without saying that the Council wishes us to treat this as a finding of fact subject to the "clearly erroneous" standard of Fed.R.Civ.P. 52(a); while the Secretary contends that it is a legal conclusion subject to plenary review. Although we can find no cases discussing this matter, we do note that courts appear to treat the reasonableness of qualifications for union office under section 401(e) of the Act--a closely related issue--as a question of law. See, e.g., United Steelworkers v. Usery, 429 U.S. 305, 309, 97 S.Ct. 611, 614, 50 L.Ed.2d 502 (1977); Donovan v. CSEA Local Union 1000, 761 F.2d 870, 875-77 (2d Cir.1985). Like "reasonableness" under section 401(e), "reasonableness" under section 401(c) primarily involves considerations of "consistency with the Act's command to unions to conduct 'free and democratic' elections." United Steelworkers, 429 U.S. at 309, 97 S.Ct. at 614 (quoting Wirtz v. Hotel Employees Union, Local 6, 391 U.S. 492, 499, 88 S.Ct. 1743, 1748, 20 L.Ed.2d 763 (1968)); see also Marshall v. Provision House Workers Union, Local 274, 623 F.2d 1322, 1325 (9th Cir.1980) ("Because rules governing distribution of campaign materials, like qualifications for candidacy, implicate fairness of union elections, Local 274's failure to mail the challengers' literature should be tested against the Hotel Employees standards"). Thus, although the issue involves numerous underlying factual findings (as to which we will reverse the district court only if clearly erroneous), we conclude that the ultimate determination of "reasonableness" in this context should be treated as an issue of law. Accordingly, our review is plenary.
 
 
 16
 It is important, too, to note what this case is not about. Although section 401(c), in language not quoted above, prohibits "discrimination in favor of or against any candidate with respect to the use of lists of members," it is not contended here that the April 15th deadline was applied in a discriminatory manner. Nor is this case one in which the union has refused all requests to distribute literature. Cf. 29 C.F.R. Sec. 452.69 (noting that "a union rule refusing all such distributions would not be proper, even though applied in a nondiscriminatory fashion"); Marshall v. Local 478, Laborers' Int'l Union, 461 F.Supp. 185, 191 (S.D.Fla.1978). The District Council concedes that it was under an affirmative duty to comply with reasonable requests to distribute campaign literature; only the scope of that duty is at issue here.
 
 
 17
 The few cases on this subject appear to have focused, as the district court did here, on the reasonableness of the union's rules regarding distribution of campaign literature. E.g., Hodgson v. Local Union 582, 350 F.Supp. 16, 21 (C.D.Cal.1972); Marshall v. Local Lodge No. 79, Int'l Ass'n of Machinists, 96 Lab.Cas. (CCH) p 13,975 (W.D.Wash.1981).
 
 
 18
 In Marshall v. Provision House Workers Union, 623 F.2d 1322 (9th Cir.1980) (per curiam), the defendant union local established a rule that candidates wishing the union to distribute campaign literature must file a request with the union within ten days after the nomination meeting. A number of candidates requested distribution after the ten-day period--apparently because they only became aware of the rule belatedly--and were denied. The Secretary contended that enforcing the rule under those circumstances violated section 401(c). The Court of Appeals disagreed. It noted, first, that the candidates' apparent unawareness of the rule was due to their own negligence. Moreover, "enforcement of the ten-day rule may have been necessary. Making exceptions to the rule ... could have undercut the purpose of the election rules--to eliminate the potential for discrimination among candidates by establishing a uniform set of standards governing all candidates."
 
 
 19
 Indeed, the Department of Labor itself has recognized the desirability of uniform rules governing requests to distribute campaign literature. In 29 C.F.R. Sec. 452.67 it has stated:
 
 
 20
 When the [union] organization or its officers authorize distribution of campaign literature on behalf of any candidate, similar distribution under the same conditions must be made for any other candidate, if he requests it. In order to avoid charges of disparity of treatment among candidates, it is advised that a union inform all candidates in advance of the conditions under which distributions will be made and promptly advise them of any change in those conditions.
 
 
 21
 (Emphasis added.)
 
 
 22
 We agree that a union may adopt and enforce reasonable, non-discriminatory rules for the distribution of campaign literature in compliance with section 401(c). Unlike the ad hoc balancing test which the Secretary here would require the union leadership to engage in whenever a request for distribution is made, permitting the imposition of uniform rules avoids even the appearance of disparate treatment. Moreover, by minimizing judicial second-guessing, permitting such rules furthers the Act's policy of "balanc[ing] between the public interest in free and democratic union elections on the one hand, and the importance of minimizing government encroachment on union autonomy, on the other hand." Brennan v. Local 122, Amalgamated Clothing Workers, 564 F.2d 657, 660 (3d Cir.1977) (footnote omitted).
 
 
 23
 The union's rule here was a reasonable one. The district court found that making the mailing labels available after April 15th--five weeks before ballots were mailed to members and seven weeks before they were returnable--"allowed adequate time within which to run a mail campaign." We note in particular that the union permitted a candidate to make an unlimited number of mailings during that period. Given those facts, the union's rule is not inconsistent "with the Act's command to unions to conduct 'free and democratic' elections." Hotel Employees, 391 U.S. at 499, 88 S.Ct. at 1748. Although McCloskey may have had legitimate reasons for wanting earlier mailings, "[w]e must judge the ... rule not by the burden it imposes on the individual candidate but by its effects on free and democratic elections." United Steelworkers, 429 U.S. at 310-11 n. 6, 97 S.Ct. at 615 n. 6 (discussing eligibility rules).
 
 
 24
 Accordingly, we conclude that no violation of section 401(c) occurred.
 
 III.
 A.
 
 25
 The Secretary's second contention is that the distribution of minutes of the February and March meetings and of the "correction" to the February minutes, containing statements tending to discredit McCloskey's campaign, violated section 401(g) of the Act, 29 U.S.C. Sec. 481(g). That section provides:
 
 
 26
 No moneys received by any labor organization by way of dues, assessments, or similar levy ... shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.
 
 
 27
 An expenditure of any size may constitute a violation. Shultz v. Local 6799, United Steelworkers of America, 426 F.2d 969, 972 (9th Cir.1970). The district court found that the minutes (and, by clear inference, the "correction") were prepared, reproduced, and distributed with Council funds.[2] The Council contends, however, that those documents did not "promote the candidacy" of the incumbent. Whether an expenditure falls within the purview of the statute is a question of law over which we exercise plenary review.
 
 
 28
 In a similar if not exactly analogous context, courts have often been faced with determining whether coverage of an incumbent officer in a union newspaper constitutes forbidden promotion of the incumbent's candidacy. See, e.g., Usery v. International Org. of Masters, Mates and Pilots, 538 F.2d 946, 949 (2d Cir.1976); Camarata v. Int'l Bhd. of Teamsters, 478 F.Supp. 321, 330 (D.D.C.1979), aff'd mem., 108 LRRM 2924 (D.C.Cir.1981); New Watch-Dog Committee v. New York City Taxi Drivers Union, Local 3036, 438 F.Supp. 1242, 1250-51 (S.D.N.Y.1977); Yablonski v. UMW, 305 F.Supp. 868, 871 (D.D.C.1969).
 
 
 29
 These courts have recognized that an incumbent "will in the nature of things be an important participant in many matters of interest to the membership and be more likely to have his participation in these matters the subject of inclusion in any report to the membership through the [newspaper]." Yablonski, 305 F.Supp. at 871. "So long as such coverage is addressed to the regular functions, policies and activities of such incumbents as officers involved in matters of interest to the membership, and not as candidates for reelection, there is no violation of [the Act]." Camarata, 478 F.Supp. at 330. Section 401(g) is only violated when "the tone, content and timing of the ... publications ... effectively encourage[ ] and endorse[ ] the re-election of [the incumbent]." Donovan v. National Alliance of Postal and Federal Employees, 566 F.Supp. 529, 532 (D.D.C.1983), appeal dismissed, 740 F.2d 58 (D.C.Cir.1984); cf. New Watch-Dog Committee, 438 F.Supp. at 1251.
 
 
 30
 A similar analysis seems appropriate here. For the Council meetings to function effectively, participants must have some latitude to speak freely about matters of current concern to members, although these may often be campaign issues as well, and even though their statements may be made with that fact in mind. As the Camarata court noted, "[d]uly elected union officials have a right and a responsibility to exercise the powers of their office and to report to the membership on issues of general concern." 478 F.Supp. at 330. And the minutes will only serve their purposes--recording the Council's deliberations, and informing the membership of those deliberations and of actions taken--if they accurately reflect what is said at the meetings. This is not to say that anything said at a Council meeting and reported in the minutes is thereby immune from scrutiny under 401(g); on the contrary, union officers may not use official time or minutes distributed with union funds to campaign. See 29 C.F.R. Sec. 452.76 (union officers are forbidden to campaign on union time or to use union funds to assist their campaigning). But in deciding whether a given act constitutes campaigning, we must be mindful of the union's need for free and open discussion if it is to govern itself effectively.
 
 B.
 
 31
 In light of these principles, we examine the conduct that the Secretary contends violated section 401(g): the remarks by business agent Dooley and International vice-president Walish at the February and March District Council meetings; the reporting and dissemination of those remarks in the District Council's minutes; and the dissemination of the "corrected" version of Dooley's remarks and the accompanying Lavine letter.
 
 
 32
 We agree with the district court that neither Dooley's nor Walish's remarks constituted forbidden campaigning. Dooley reported to the council in regular order about McCloskey's lawsuit--a matter of current concern of which Dooley had special knowledge. Similarly, Walish appeared and spoke at the March meeting as part of his job as International liaison with union organizations in his district. It is true that neither man hid his views about the upcoming election, and that certain of their statements, taken in isolation, more or less subtly attacked the insurgent McCloskey. Considered as a whole, however, both sets of remarks were "addressed to the regular functions, policies and activities of such incumbents as officers involved in matters of interest to the membership, and not as candidates for reelection." Camarata, 478 F.Supp. at 330. Although Walish's remarks in particular skate close to the edge, we do not think that either man's statements amounted to a violation of 401(g).
 
 
 33
 Nor did the initial summary and distribution of these remarks in the minutes violate the Act. The district court found that "[h]istorically, the minutes were very extensive and detailed," and that the initial summary of Dooley's remarks was--with the one exception--accurate and "no more prominently displayed or extensively reported than were the reports of the other business agents." Similarly, it is not contended that Walish's remarks were inaccurately summarized or unduly highlighted. We conclude, therefore, that the minutes were used for their proper purposes--accurately summarizing and reporting the Council's deliberations. Although it was apparently somewhat unusual for a speaker to edit the text of his remarks for publication in the minutes, as Walish did, that fact alone does not transmute the minutes into campaign material.
 
 
 34
 Unlike the district court, however, we believe that the "correction" of the February minutes with the accompanying Lavine letter did amount to use of the minutes as a "campaign tool." Hodgson v. UMW, 344 F.Supp. 17, 23 (D.D.C.1972). While the original report of Dooley's comments was only three sentences long, the ostensible correction consumed six times the length of the original, although the only error in the original was the mistaken substitution of "printer" for "bulk-mailing house." Included in the corrected version, but not in the original, was a lengthy oration concerning the "sacred trust" imposed upon union officers to maintain the confidentiality of membership lists, an implicit attack on McCloskey for having breached that confidentiality. This attack was underscored by the Lavine letter, which reiterated that the bulk-mailing house used by McCloskey was non-union and charged McCloskey with using a false union label on his mailings. As found by the district court, the Lavine letter "was inserted by someone without the authority of the Secretary-Treasurer, and was a matter that did not occur at or during a District Council meeting."
 
 
 35
 It is plain that the Lavine letter served neither of the purposes of ordinary Council minutes: it did not record the Council's deliberations, and therefore did not inform the membership of what had transpired at the meeting. It is equally plain that the corrected version of Dooley's remarks, while accurate, unjustifiably highlighted those remarks with the intent of hindering McCloskey's candidacy. The use of union money to distribute those documents accordingly violated section 401(g). The mere fact that these documents were distributed in response to McCloskey's demand for a correction of the minutes does not excuse this violation, since what was distributed went far beyond the asked-for correction.IV.
 
 
 36
 Section 402(c) of the Act, 29 U.S.C. Sec. 482(c), provides that the district court shall declare a union election void and order a new election if it finds that a violation of section 401 has occurred and that the violation "may have affected the outcome of [the] election." The district did not reach the latter issue. Although we recognize the difficulty of quantifying the effect of such a violation as occurred here on the election result, see Hotel Employees, 391 U.S. at 506-09, 88 S.Ct. at 1751-53, the language of the statute clearly calls for the district court to address this issue in the first instance.
 
 
 37
 Accordingly, we will affirm the judgment of the district court with respect to the Secretary's claim under section 401(c). With respect to the Secretary's claim under section 401(g), we will reverse the judgment of the district court and remand to enable the district court to determine the effect of this violation on the election.
 
 
 38
 Each party shall bear its own costs.
 
 
 
 [1]
 McCloskey also obtained an "unofficial," and substantially inaccurate, membership list, and issued a number of mailings using that list
 
 
 [2]
 The district court expressed some doubt about whether there was any expenditure attributable solely to the contested portion of the minutes. But a violation occurs whenever union funds are used to distribute campaign material, regardless of whether the expense would have been incurred in any event. Any other rule would give incumbents an advantage wholly in conflict with the intent of the Act