UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION X BY THE INDEPENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court, S.D. New York.

July 10, 1990.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Edward T. Ferguson, III, Asst. U.S. Atty., of counsel), for the U.S.

Michael H. Holland, Election Officer, Chicago, Ill. (Frederick B. Lacey, Independent Admin'r, Newark, N.J., Stuart Alderoty, of counsel), Mudge, Rose, Guthrie, Alexander & Ferdon, New York City (Jed S. Rakoff, Audrey Strauss, Robert P. Knapp, III, Jack Levine, Vincent P. Esposito, Jr., Ralph P. DeSanto, of counsel), for defendant Intern. Broth. of Teamsters.

Friedman & Levy–Warren, New York City (Eugene S. Friedman, Jay P. Levy–Warren, of counsel), for IBT Locals 282 and 707.

Paul, Weiss, Rifkind, Wharton & Garrison (Robert S. Smith, of counsel) (Helen Hershkoff, American Civil Liberties Union Foundation, New York City, Thomas Geoghegan, Despres, Schwartz & Geoghegan, Chicago, Ill., Paul Alan Levy, Public Citi-

zen Litigation Group, Washington, D.C., of counsel), for *amici* Teamsters for a Democratic Union;

Susan M. Jennik, Gen. Counsel, Brooklyn, N.Y. (Clyde W. Summers, Judith Schneider, of counsel), for *amici* Ass'n for Union Democracy.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB"). The settlement is embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The remedial provisions in the Consent Decree provided for three Court-appointed officials, the Independent Administrator to oversee its provisions, an Investigations Officer to bring charges against corrupt IBT members, and an Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and prosecution provisions.

Application X by the Independent Administrator presents for this Court's review the final set of election rules for the 1991 IBT election for International Officers. During the course of the implementation of this Consent Decree, this Court has been called upon to decide matters large and small. But of all the tasks put before it, no question is more central to the ultimate success of this Consent Decree than this proposed framework for the first fully democratic, secret ballot elections in the history of a union which has been the historic marionette of organized crime. An election under these rules beacon the coming of the light of freedom to this dark union.

These election rules must not be viewed in a vacuum, but instead placed in their proper context. This Court has reiterated that this Consent Decree is a unique attempt to cleanse this union. These election rules are the linchpin in that effort. This Court will only approve election rules that will guarantee honest, fair, and free elections completely secure from harassment, intimidation, coercion, hooliganism, threats, or any variant of these no matter under what guise.

Before examining the election rules and objections to them in detail, this Court must emphasize that its notion of fair, free and honest elections means more than just an honest ballot. Fair elections demand that IBT members are given a meaningful uncoerced choice of candidates. Candidates must be freed of any hesitation about speaking openly on issues, including criticism of the incumbent IBT structure. Candidates must be fearlessly free to communicate those views to the membership. Members must be assured and given confidence that they need not fear to engage in untrammelled discussion.

## I. The Rules Promulgation Process

The election rules submitted to this Court were promulgated by the Election Officer pursuant to ¶ F.12.(D) of the Consent Decree, which authorizes the Election Officer to supervise all phases of the 1991 Election for International Officers. *See* Consent Decree, ¶ F.12.D at 15; *see also United States v. International Brotherhood of Teamsters*, 723 F.Supp. 203, 206–07 (S.D.N.Y.1989) (the "October 18, 1989 Decision") *appeal dismissed* (unpublished order, 2d Cir. Dec. 13, 1989), *petition for rehearing en banc denied*, (unpublished order, 2d Cir. Feb. 12, 1990), *cert. denied* (June 11, 1990).

The October 18, 1989 Order of this Court established that the parties intended the Election Officer to have broad power actively to supervise the entire 1991 election for International Officers. The promulgation of electoral rules is an integral part of that mandate. The October 18, 1989 Order also authorized the Election Officer to follow a timetable for the 1991 election. Application X presenting these electoral

rules comports with the schedule for these events. *See id.*

The Election Officer followed the notice and comment rulemaking process to promulgate these final election rules. The Election Officer drafted a set of proposed electoral rules, (the "proposed election rules") and distributed these to all IBT entities on February 22, 1990. The Election Officer then held a series of eight hearings from March 6 through March 27 around the United States and Canada to solicit comments from all interested entities about the proposed election rules.[1] The transcripts of these hearings are part of Application X and public record filed with the Court. The Election Officer then considered the comments from the hearings in addition to submitted written commentary in promulgating the final rules. These final rules are the substance of Application X. In addition the Election Officer has released commentaries as a companion to the final election rules, (the "election rules commentaries"). The election rules commentaries further demonstrate the comprehensiveness of the Election Officer's work.

The Court is satisfied that the Election Officer proceeded in a methodological way such that the IBT membership and subordinate entities were afforded an ample opportunity to participate, comment, and make their input part of the public record of these final election rules.

## II. Objections to the Final Rules

### A. General Objections

The IBT again reiterates its position that the Election Officer has no specific authority under the Consent Decree to promulgate election rules. The IBT conceded in a footnote that these same arguments were rejected by this Court's decision of Application II. *See* October 18, 1989 Opinion, *supra,* 723 F.Supp. at 206–07, *appeal dismissed* (unpublished order, 2d Cir. Dec. 13, 1989), *petition for rehearing en banc denied,* (unpublished order, 2d Cir. Feb. 12,

1990), *cert. denied* (June 11, 1990). The IBT's asking this Court to revisit this final ruling is frivolous. My decision stands.

■ Locals 282 and 707 assert that as locals they are not bound by the Consent Decree's changes to the IBT constitution. This Court has already set out in detail its reasoning on the binding effect of the Consent Decree. *See* January 17, 1990 Opinion and Order of this Court, (the "All Writs Act Opinion"), 728 F.Supp. 1032, 1048–57 (S.D.N.Y.1990), *aff'd* 907 F.2d 277 (2d Cir. 1990). That specific reasoning is incorporated into this order by reference. This Court now specifically orders that the local unions are bound by the election provisions of the Consent Decree.

### B. Specific Objections

Challenges to particular election rules will be considered separately.

#### 1. Article II, § 1 of the Final Election Rules

■ The IBT protests that this rule—which sets a formula for the number of alternate delegates that each local union must elect—is at odds with Article III, § 5(a)(2) of the IBT Constitution. In their objections to this rule the IBT ignores the underlying problem which Article II, § 1 of the final election rules corrects. The Consent Decree prohibits delegates from participating at the international convention unless directly elected. Without this rule, those locals that do not elect alternate delegates would be disenfranchised should some elected delegates be unable to attend the international convention. In addition, those locals whose relative delegate strength increased between the local delegate election and the international convention will have a reservoir from which to draw alternate delegates.

The final election rule at Article II, § 1 is within the Election Officer's authority to supervise this election. Accordingly, the

---

**1.** The hearings were held in San Francisco, California; Seattle, Washington; White Plains, New York; New York, New York; Baltimore, Maryland; Chicago, Illinois; Memphis, Tennessee; Cleveland, Ohio; and Toronto, Ontario, Canada. At least one hearing was held within the geography of each IBT area conference.

IBT's challenge to Article II, § 1 of the final election rules is denied.

### 2. Article II, § 2 of the Final Election Rules

█ The IBT challenges the provision at Article II, § 2 of the final election rules— requiring each local to submit a local union plan to the Election Officer—as beyond the scope of the Consent Decree. The local union plan must detail for the Election Officer that local's specific procedure for the elections.[2]

The final election rule's requirement of a local union plan falls within the authority of the Election Officer to supervise this election. The Election Officer cannot supervise this election without the specific information contained in a local union plan.

█ The IBT further objects to the Election Officer's intention to conduct all phases of the election of any local which does not submit a local union plan. The IBT again argues such a rule goes beyond the scope of the Consent Decree. The Election Officer contends that he must certify the result of each election. Should a local not submit a local union plan, he is left with two choices: either conduct that local's election, or refuse to certify that local's election, thereby disenfranchising the membership of that local.

An intent of the election provisions of the Consent Decree is to give the IBT membership a real and honest voice through direct elections. A course of action which would disenfranchise any portion of the membership is intolerable. The Election Officer's intention to conduct the election of any local which refuses to submit a local union plan falls within his authority to supervise this election.

Accordingly, the IBT's challenges to this rule are hereby denied.

---

**2.** The local union plan requires a local to set forth (1) the date of issuance of the notice for the nomination meeting and delegate election; (2) the dates of the nomination meeting and delegate election; (3) a description of the composition of the local election committee; (4) information about any outside election agency used to conduct the election; (5) method for conducting the election; (6) the method of

### 3. Article III; Article VIII, § 9; Definitions, ¶ 2 of the Final Election Rules

The IBT disputes the provisions of the final election rules which provide that accredited candidates for union office may have their campaign literature published in the *International Teamster*. The standards for candidate accreditation are delineated at Article III of the final election rules. A candidate may become accredited under Article III of the final election rules principally by obtaining signatures from 2.5% of the "membership of the relevant membership pool." Article III, § 1, Final Election Rules at 23. Accredited candidates and those nominated for international office may have their "campaign literature published in the IBT Magazine" as set out in Article VII, § 9 of the final election rules. The IBT argues that the accreditation of candidates itself goes beyond the scope of the Consent Decree.

█ The IBT further contends that publication of accredited candidate literature in the *International Teamster* exceeds the Election Officer's power "to distribute materials about the election to the IBT membership." ¶ F.12.(D), Consent Decree at 15. The IBT asserts that the Consent Decree specifically enumerates when the Court Officers may publish material in the *International Teamster*, and ¶ F.12.(D) does not explicitly grant the Election Officer such a right. The IBT points out that ¶ F.12.(E) expressly provided that the Independent Administrator should report to the membership in each issue of the *International Teamster*.

This argument by the IBT is unpersuasive. The Election Officer has determined that dissemination of campaign literature through the *International Teamster* is the

---

counting the ballots; (7) the number of alternate delegates to be elected; (8) the number of delegates whose expenses the local will pay to attend the international convention; (9) the number of alternates to be sent to the international convention with expenses paid; (10) a list of rule modifications approved by the Election Officer; (11) other information requested by the Election Officer.

most efficient and effective vehicle for him to "distribute material about the election to the IBT membership." ¶ F.12.(D), Consent Decree at 15. That ¶ F.12.(E) of the Consent Decree directly authorizes the Independent Administrator to publish a monthly report in the *International Teamster* does not bar a determination that the Election Officer's right "to distribute material to the membership" under ¶ F.12.(D) allows publication of campaign literature in the *International Teamster*.

■ The IBT's argument that these publication rules violate the IBT's right of free speech by compelling that organization to publish certain speech in the *International Teamster* is similarly unconvincing. While labor unions are not ordinarily required to publish "contrary views," *Camarata v. International Bhd. of Teamsters*, 478 F.Supp. 321, 330 (D.D.C.1979), *aff'd* 108 L.R.R.M. (BNA) 2924 (D.C.Cir.1981), this election is no ordinary circumstance. Its circumstances require special measures. This Court has previously found that implementing the remedial scheme embodied in the Consent Decree is an extraordinary circumstance requiring "special consideration." All Writs Act Opinion, *supra*, 728 F.Supp. at 1045. The more general authority cited by IBT, *e.g., Wooley v. Maynard* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977); *Pacific Gas & Electric Co. v. Public Utilities Comm'n of California*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) is therefore inapposite.

This Court is not prohibited from ordering that the *International Teamster* be open to campaign material under special circumstances. In the past, a court ordered such publication in the 1972 election for president of the United Mine Workers union. *See Hodgson v. United Mine Workers of America*, 344 F.Supp. 17, 36 (D.D.C.1972).

The IBT relies on the *Camarata* decision to argue that a court *cannot* compel a union to publish campaign material in a union publication under *any* circumstances. But that conclusion is misplaced, since the *Camarata* court determined only that the situation it faced presented an inappropriate circumstance to compel such publication. In *Camarata,* the court found that the plaintiff had announced his candidacy for IBT General President solely to "gain access to the *I.T.* [*International Teamster*]." *Camarata, supra,* 478 F.Supp. at 329. No such circumstance exists here.

It should not be forgotten that the IBT has bitterly opposed the inclusion of any material arising from the Consent Decree in the *International Teamster*. The IBT objected to monthly reports of the Independent Administrator in the *International Teamster,* and this Court enforced the Independent Administrator's rights to a monthly forum. Contest over that right prompted Application VI by the Independent Administrator, and this Court's decision in a Memorandum & Order dated November 16, 1989 (the "November 16 Memorandum"), *appeal dismissed* (unpublished order, 2d Cir. Dec. 13, 1989), that the Independent Administrator has a right to report monthly to the membership in the *International Teamster.*

This Court has continually recognized that the dissemination of information benefits the IBT membership, which has a right and need to know about these matters that affect their union. No opposition candidate may mount a viable challenge to the entrenched IBT plutocracy without standing on an equal footing with regard to distribution of their views.

The standards delineated in Article III of the final election rules governing the accreditation process regarding which candidates may become accredited are fair and uniform. The intention of the Election Officer to publish campaign statements of accredited candidates in the *International Teamster* pursuant to Article VII, § 9 of the final election rules is an efficient method to accomplish this important dissemination of information.

Accordingly, the IBT's challenge to these rules is denied.

#### 4. Article IV, § 3 of the Final Election Rules

█ The IBT objects to the detailed schedule of nominations and elections of various officers at the 1991 IBT General Convention. It is ludicrous to assert that scheduling nominations and ballots at the 1991 convention transgresses the Election Officer's authority to "supervise" the IBT election located at ¶ F.12.(D) of the Consent Decree. Scheduling such activities is squarely within the Election Officer's duties.

Accordingly the IBT's objection to this rule is denied.

#### 5. Article IV, §§ 3(b), 3(d) of the Final Election Rules

The IBT objects to these two final election rules mandating that nomination votes for IBT international officers be by secret ballot. In ¶ F.12.(D)(ii), the Consent Decree specifically provides for an international convention "with all convention Candidate election voting by secret ballot of each delegate individually." Consent Decree at 14.

Accordingly, the IBT's objections to these two rules are denied.

#### 6. Article VIII, § 2 of the Final Election Rules

█ Article VIII, § 2(a) of the final election rules provides for limited release of IBT membership lists to candidates. Article VIII, § 2(b) permits release of a random sampling of names from the membership lists to a polling entity so that an accredited candidate may conduct opinion polling. Those submitting papers to this Court deeply divide on these rules. The IBT contends that Article VIII, § 2(b) violates privacy rights of members and expands the bounds of the Consent Decree by releasing private membership lists to outside parties—opinion polling entities. *Amici* Teamsters for a Democratic Union ("TDU") object to the limits Article VIII § 2(a) places on access to membership lists. The Court finds Article VIII, § 2 of the final election rules flawed.

Article VIII, § 2(a) of the final election rules sets the parameters for a candidate's right to inspect IBT membership lists, the availability of which is critical to a candidate's ability to raise funds and make his views known to the membership. Article VIII, § 2(a) as promulgated, tracks the Department of Labor regulation interpreting this right of inspection, 29 C.F.R. § 452.71 and comports with the parameters for inspection of membership lists set out in § 401(c) of the Labor–Management Reporting and Disclosure Act ("LRMDA"), 29 U.S.C. § 481(c). Together, the statute and regulation allow a bona fide candidate to inspect and compare the membership lists with their own records within 30 days of a particular election. A candidate's right of access may be increased upon a finding that the union misused the membership list. 29 C.F.R. § 452.71(b).

In Article VIII, § 2(a) of the final election rules, the Election Officer rejects full distribution of IBT membership lists to accredited candidates on the ground that such lists are protected by statute. *See* Commentary to Final Election Rules at 20–22; *see also* 29 U.S.C. § 481(c); 29 C.F.R. § 452.71. Article VIII, § 2(b) of the final election rules allows third parties access to membership lists beyond the limits of 29 C.F.R. § 452.71. In their memorandum in support of the final election rules the Independent Administrator and Election Office explain this inconsistency by arguing that the LRMDA's limit on access to membership lists is only conditional. Limited release to opinion polling entities, their argument goes, allows candidates to solicit funds and sample membership attitudes without running afoul of the LRMDA.

In his election commentary, the Election Officer stated that many commentators urged him to adopt a more liberal view on the release of IBT membership lists to candidates. *See* Commentary, Final Election Rules at 22. He rejected such a position, reasoning that since no judicial finding has been made that the IBT misused its membership lists in the instant election, he was bound by 29 C.F.R. § 452.71. The Election Officer distinguished this election from the 1972 United Mine Workers rerun election,

where a court ordered that union to release its membership lists after a judicial finding of misuse. *See Yablonski v. United Mine Workers of America et al.*, 72 L.R.R.M. 2076; *Yablonski v. United Mine Workers of America et al.*, 305 F.Supp. 868 (D.D.C. 1969); *Hodgson v. United Mine Workers of America*, 344 F.Supp. 17 (D.D.C.1972).

The IBT concurs with the Election Officer that absent a specific finding that the IBT has misused its membership lists, the LRMDA precludes their release. The IBT further argues that the purpose of the bar against copying or distribution of membership lists is to avoid the "danger that lists so copied would be used for improper purposes by employers, rival unions, subversive organizations, and the like." *Conley v. Aiello*, 276 F.Supp. 614, 616 (S.D.N.Y. 1967).

This Court disagrees with Article VIII, § 2(a) of the final election rules, and concludes that rule should be amended to allow accredited candidates access to membership lists. The conditional protection afforded membership lists should be overridden for two reasons. First, extraordinary measures are necessary to ensure that this election succeeds in upholding the permanent injunction at ¶ E.10 barring IBT association with organized crime. Second, the IBT has misused its membership lists in its incessant attacks against the Court Officers, Government and this Court objecting to the implementation of the Consent Decree in the *International Teamster*. In these attacks the IBT has revealed its opposition to free elections. Additionally, the IBT's behavior over the past year indicates official rejection of reform and with it free elections. While not dispositive, the IBT's official stance is relevant to this determination.

First, release of the membership lists is necessary to uphold the permanent injunction that enjoins any member of the IBT, past or present, from associating with organized crime. The secret ballot election process provided for in paragraph F.12.(D) of the Consent Decree is a critical element in the effort to rid the IBT of the influence of organized crime. In signing the consent

Decree, the IBT and the individual signatories admitted that elements of the IBT have been corrupted by organized crime. The defendants consented to a permanent injunction barring any future contact with organized crime. The fourth, fifth and sixth "WHEREAS" clauses of the Consent Decree, together with the permanent injunction located at ¶ E.10, indicate an explicit intention to rid the IBT of the influence of organized crime. Without strong and extraordinary measures taken to foster alternative candidates, the goal of an IBT "maintained democratically, with integrity and for the sole benefit of its members without unlawful outside influence" (Consent Decree, sixth WHEREAS clause) will not be possible. This rationale alone would justify release of the membership lists to accredited candidates.

Second, specific articles in the IBT monthly magazine the *International Teamster* constitute the IBT's misuse of its membership lists for the purpose of subverting a free and fair election by assailing the legitimacy and integrity of the Court Officers and damaging the possibility of reform. The IBT leadership has used the *International Teamster* as a propaganda tool for self-aggrandizement and for the purpose of torpedoing the Consent Decree and its designated officers.

■ The *International Teamster* is a monthly publication of the IBT sent out to all its members. The protection afforded union membership lists by labor law is conditional, not absolute, but courts should release these lists only when the union misuses the membership list. *See, e.g., Hodgson v. United Mine Workers, supra,* 344 F.Supp. at 17–35.

In the 1969 UMW election, a specific finding was made that incumbent candidates had misused the membership lists to discriminate against challengers. This misuse was manifested through extensive coverage over a period of months of the incumbent candidate in the official UMW magazine, with no mention of the challenger. *Yablonski v. United Mine Workers et al., supra,* 72 L.R.R.M. 2076; *Yablonski v. United Mine Workers et al., supra,* 305

F.Supp. 868–76. Those findings were later used in part to invalidate the 1969 election and order a re-run in 1972. *Hodgson v. United Mine Workers of America, supra,* 344 F.Supp. at 17–35. As a result of incumbent misuse of the UMW magazine, the *Hodgson* court ordered that a complete membership list be compiled and released to any bona fide candidate. *Hodgson, supra,* 344 F.Supp. at 36.

■ Accordingly, a fatally biased official editorial posture in the official union publication that might affect the union's election can constitute misuse of a membership list for the purposes of § 401(c) of the LRMDA and 29 C.F.R. § 452.71. The IBT has misused union membership lists through the form of articles that are primarily, but not exclusively, couched as responses to the monthly Report to the Membership of the Independent Administrator in the *International Teamster* which are highly critical of the Court Officers and this Court. This criticism of the Court Officers is evidence of the IBT's official policy of opposition to reform, intended to diminish the integrity of this election to the membership.

A detailed review of the *International Teamster* is evidence that the IBT has been engaged in a fatally biased official editorial posture that may affect the 1991 election. The IBT has reserved its most severe criticism for the section styled a "memorandum" from General Counsel Grady to General President McCarthy, begun in the August, 1989 issue of the *International Teamster*. In the August, 1989 "memorandum," the IBT criticized the Independent Administrator and Election Officer, accusing both of actions that transgress the Consent Decree. The September, 1989 "memorandum" attacked the billing rates of the Court Officers and their staffs, and opposed the inclusion of the monthly report of the Independent Administrator. The notable October, 1989 "memorandum" assailed the Election Officer as overstepping his bounds, and accused the other Court Officers of "constantly seeking to expand their 'powers.'" Further, the IBT accused the Court Officers of seeking to expand their powers for their own political gain. The "memorandum" accused "Rudy Guiliano" <sic> of filing the underlying suit to gain publicity for himself in his campaign for Mayor of New York City. General Counsel Grady also quoted an anonymous IBT member from the midwest who asked President McCarthy to protect the membership from its protectors [the Court Officers].

In the November, 1989 issue, the "memorandum" section accused the Court Officers of being an unnecessary and expensive burden on the IBT. The December, 1989 "memorandum" again assailed the expense of the Court Officers. The January, 1990 edition included a message from General President McCarthy which accused the Government of unwanted and unjustified intrusion into IBT affairs, professed offense at the actions of certain "unelected entities" [the Court Officers] who wished to impose their designs on the IBT and ignore the needs of the membership, and vowed to further fight the Court Officers. The "memorandum" in that issue again denounced the Independent Administrator for ignoring the Consent Decree, and further accused the Court Officers of attempting to challenge the "incumbent elected officers of the IBT at all levels" since they failed to find any influence of organized crime in the IBT.

The "memorandum" in the February, 1990 issue questioned the Independent Administrator's impartiality towards disciplinary hearings since he, rather than "Mr. Cranberry" <sic> sought to publish the names of those IBT members facing disciplinary action. Further, the IBT accused the Independent Administrator of disregarding the IBT Constitution in his decision to ignore the November 1, 1989 resolution of the GEB. In the April, 1990 edition, the *International Teamster* gave extensive coverage to a meeting of the Canadian IBT officers, who authorized the Canadian conference to "go to court to oppose the application of the Consent Order in Canada."

■ This finding of misuse does not infringe on the free speech rights of the

IBT. While the IBT was and is free to speak on any matter concerning the Consent Decree, under labor law official union commentary may influence other statutory rights, including the right to a free election. In this instance, the official position of the IBT is one of opposition to the Court Officers' implementing reform. This IBT policy demonstrates an devious design to deceive the membership into believing that reform is unnecessary and these elections wasteful.

The IBT's concerns about the released lists being used for improper purposes, *see, e.g., Conley v. Aiello, supra,* 276 F.Supp. at 616, are inapplicable. Indeed, instead of endangering the membership, release of the membership lists in this election furthers the interests of the IBT rank and file for the purpose of ensuring full, fair and free elections. Additionally, such release would only be to IBT members seeking office, minimizing any potential dangers. Misuse of the election lists by candidates would be punishable upon pain of contempt.

Finally, the IBT has displayed a pattern of reluctance to comply with the specific terms of the Consent Decree absent judicial intervention, indicating the IBT's official opposition to reform. The IBT has refused to furnish office space and challenged the need for file cabinets; delayed in reimbursing the Court Officers, thereby necessitating the creation of a $100,000 fund for their work (*see* October 18, 1989 Opinion, 723 F.Supp. at 209–10, *appeal dismissed* (unpublished order, 2d Cir. Dec. 13, 1989), *petition for rehearing en banc denied,* (unpublished order, 2d Cir. Feb. 12, 1990), *cert. denied* (June 11, 1990)); bitterly disputed the authority of the Election Officer to serve as more than a passive observer to the 1991 election (*id.* at 205–09); protested the hiring of staff members for the Court Officers (*id.* at 208–09); and passed resolutions changing the disciplinary provisions of the IBT Constitution in disregard of ¶ L.17 of the Consent Decree. Those resolutions baldly exculpated a former member of the GEB who was a convicted felon from facing disciplinary charges and were determined to be unreasonable by all reviewing

courts (*see United States v. International Bhd. of Teamsters,* 735 F.Supp. 506 (S.D.N. Y.1990) *aff'd* 905 F.2d 610 (2d Cir.1990).

The IBT attempted to curtail publication of the *International Teamster* from monthly to quarterly; sent out a memorandum to every local urging that the locals object before this Court to an injunction requiring all litigation concerning the Consent Decree be conducted before this Court, among other actions (*see* All Writs Act Opinion, 728 F.Supp. at 1054–55, *aff'd* 907 F.2d 277 (2d Cir.1990). The IBT currently objects to the Election Officer hiring regional coordinators to assist in supervising the election (Application XI). While not dispositive towards a finding of misuse, this pattern of conduct illuminates the IBT's official stance toward reform and supports the conclusion of official antipathy.

Accordingly, Article VIII, § 2(a) must be amended so that the membership lists will be released to any accredited IBT candidate. Further, the IBT's challenge to Article VIII, § 2(b) is denied.

### 7. Article VIII, § 5 of the Final Election Rules

The IBT contests as costly and beyond the mandate of the Election Officer's duties this rule which authorizes the Election Officer to "schedule and conduct International Officer candidate forums" to be covered by print and broadcast media. This rule furthers the duty of the Election Officer to "distribute materials about the election to the ... membership" set out in ¶ F.12.(D) of the Consent Decree.

Accordingly, the IBT's challenge to this rule is denied.

### 8. Campaign Contributions and Financial Disclosure Requirements of the Final Election Rules

The Election Officer has promulgated a series of final election rules incorporating ¶ D.8 of the Consent Decree, which amended the IBT constitution to include a prohibition on employer contributions. This prohi-

bition is statutorily codified by section 401(g) of the LRMDA.

a. Article X, § (1)(b)(2), Definitions, ¶ 6 of the Final Election Rules

 The IBT objects to this rule which permits a candidate to use employer contribution funds to pay fees for legal or accounting services that candidate needs to ensure compliance with applicable law. Article X, § (1)(b)(2) of the final election rules was constructed specifically to comply with the Supreme Court's ruling in *United Steelworkers v. Sadlowski*, 457 U.S. 102, 119, 102 S.Ct. 2339, 2349, 72 L.Ed.2d 707 (1982). In *Sadlowski*, the Supreme Court upheld a ban by the United Steelworkers Union on outside election contributions, but held that extending that bar to financing of litigation would "clearly violate [29 U.S.C. § 411(a)] if it prohibited union members from accepting financial or other support from non-members for the purpose of conducting campaign-related litigation." 457 U.S. at 119, 102 S.Ct. at 2349.

Article X, § 1(b)(2) of the final election rules ensures that the outsider rule complies with the *Sadlowski* decision. Accordingly, the IBT's challenge to this rule is denied.

b. Definitions, ¶ 17 of the Final Election Rules

 The IBT protests that the definition in the final election rules of an employer for the purpose of barring campaign contributions omits any mention of foundations. The IBT argues that this omission is specifically intended to allow contributions from TDU. The Election Officer responds that his definition of "employer" includes "any individual, corporation, trust, organization or other entity that employs another." The IBT's protest here is inappropriate, since they object to a potential application of the election rules, rather than a specific rule.

c. Article X, § 2

 The IBT objects to this rule— which requires each candidate nominated

for international officer to disclose information about their campaign financing and expenditures—as exceeding the scope of the Consent Decree. In order for the Election Officer to properly enforce ¶ D.8 of the Consent Decree and ensure honest, fair and free elections, such disclosure is essential. Article X, § 2 of the final election rules fall squarely within the Election Officer's mandate to "supervise" this election.

Accordingly, the IBT's objection to this rule is denied.

### 9. Article XI, § 3; Article XII, § 7 of the Final Election Rules

 The IBT objects to these two final election rules—which provide that should the Election Officer refuse to certify an election, he shall then "conduct and administer[ ]" a re-run election—as impermissibly expanding the Election Officer's mandate to "supervise" the election. This objection is joined by locals 282 and 707. As discussed earlier, since the Election Officer's authority to "supervise" is to be interpreted in its most expansive and proactive meaning, Article XI, § 3, and Article XII, § 7 are within the Election Officer's authority to "supervise" the election.

Accordingly, the challenges to these two rules is denied.

### 10. Article XIV of the Final Election Rules

 The IBT challenges Article XIV of the final election rules, which provides for extraterritorial application of the election rules. This section applies these final election rules to the Canadian IBT locals. The IBT argues that the Canadian locals are separate, autonomous, and distinct legal entities formed and operating under Canadian Law. As a result, the IBT argues that they are beyond the jurisdiction of the Election Officer.[3]

These arguments by the IBT avoid the substantive issue regarding the Canadian locals—that the Election Officer's authori-

---

**3.** The IBT also reiterates its belief that its American subordinate entities are separate and auton- omous and beyond the scope of these rules.

ty and hence these rules arise under power reserved for the IBT under its Constitution. These final election rules are applicable to the Canadian locals to the extent that the IBT itself governs the manner in which Canadian locals select delegates to the IBT international convention. Further, since the IBT is subject to United States jurisdiction, its extraterritorial subordinate entities are as well for the purposes of choosing delegates to the international convention. *See Smith v. Office and Professional Employees International Union*, 821 F.2d 355 (6th Cir.1987).

Accordingly, the IBT's challenge is hereby denied.

### III. Enforcement Concerns

■ The Court remains concerned about the fundamental philosophy of the final election rules—the intention of the Election Officer to allow local unions significant autonomy over the elections for delegates to the international convention, and over the election for international officers. This Court has stated time and again that it expects the Election Officer to fulfill his mandate to "supervise" this election in the most expansive and proactive means possible. These final election rules fall short of this mandate since they do not provide for the Election Officer to supervise each and every portion of the election process.

The Election Officer, Independent Administrator and IBT contend that these final election rules now strain the limit of acceptable supervision: To go beyond the supervision envisioned by the Election Officer, they argue, would constitute election *conduct*, rather than *supervision*. They then differentiate this election from the 1972 UMW election, where that district judge ordered that the United States Department of Labor conduct a rerun election of the disputed 1969 UMW election for president. *See Hodgson v. United Mine Workers, et al., supra.*

*Amici* Association for Union Democracy (AUD) and TDU—as well as the Government in its letter of May 14, 1990 on Application X—view "supervise" as going beyond that promoted by the Court Officers, or IBT. AUD and TDU ask this Court to reaffirm its earlier broad interpretation of the scope of the Election Officer's duty to "supervise" the election. *See* October 18, 1989 Opinion, *supra,* 723 F.Supp. at 206–09. AUD and TDU submit that this Court should authorize the Election Officer to "supervise" this election in a similar fashion to the 1972 UMW election.

For the purpose of determining the limits of "supervision" in the context of this election, comparisons to the 1972 UMW election are of limited relevance. In this matter, ¶ F.12.(D) of the Consent Decree specifically empowered the Election Officer to "supervise" the 1991 election, and the parameters of supervision must be determined from the context of this case. The supervision in this election must indeed be expansive and proactive.

The final election rules leave many critical election functions to the officers of local unions. This situation is unacceptable, since these same officers who will be conducting the elections for the international convention will have great personal stakes in the election's outcome. In order for these elections to accomplish their mission, the rank and file must have confidence in the election process.

Complete supervision of all facets of the election process is the only way to guarantee the integrity of the elections and encourage extensive rank and file participation. To that end, the Election Officer must oversee each and every facet of this election in order to prevent any possibility of fraud, coercion, intimidation, harassment, or threat in any of its varied forms. While the Election Officer has commented that he will consider the "the history of prior proceedings alleging improper election conduct" in determining the proper amount of supervision, this subjective determination is insufficient. Locals where members are intimidated or reluctant to lodge protests may be inadequately safeguarded.

Hue and cry about the costs of such supervision is disingenuous, since it disregards the cost effectiveness of reform

that will be felt across the board of this country's commerce. At the same time it would be myopic to ignore the costs mounted by the IBT in expensive litigation without regard to an understanding that a spirit of cooperation would have been a much better course to pursue.

At this point, one might recall the occasion when the Consent Decree was signed, the pledges of cooperation made by Mr. Grady, and the hopes expressed that the IBT would reform and rid itself of the corrupt influences which year after year have sullied and tainted its membership. We agreed that it was long past due the time when this union should be returned to its membership by free and open elections. The cost of democracy is high at every level of society, but few would doubt its worth. As for the membership, they must remember the price of reform is eternal vigilance.

## IV. Conclusion

Accordingly, this Court hereby orders that the listed provisions of the final election rules be amended as follows:

Article I shall be amended so that the phrase "only to the extent permitted by the these election rules" is added at the end of the first sentence of the third paragraph.

Article II, § 2(b) shall be amended so that the following functions are to be determined by the Election Officer and not the Local Union:

§ (b)(4);

§ (b)(5);

§ (b)(6);

Article II, § 8(g) shall be amended so that reference to "Local Union" shall be replaced by "Election Officer."

Article V, § 1(a) shall be amended so that "to the extent permitted by these rules" be added to the end of the first sentence.

Article VI, § 4(a)(1) shall be amended so that reference in the first sentence to "Secretary–Treasurer of his/her Local Union" shall be replaced by "Election Officer." Reference to "Local Secretary–Treasurer" in the third sentence shall be replaced by "Election Officer."

Article VI, § 4(a)(3) shall be amended so that reference to "Secretary–Treasurer of the candidate's Local Union" shall be replaced by "Election Officer."

The Election Officer shall amend Article VIII, § 2(a) to provide (1) that the IBT prepare a current membership list before September 1, 1990, (2) transfer that list to the Election Officer, (3) the Election Officer is authorized to release a copy of the appropriate membership list to an accredited candidate 30 days before the date of an election, (4) in order to obtain a copy of the membership list, the accredited candidate must submit an affidavit averring that he would not permit inspection or copying of the list to any other third parties. A violation of this order would be punishable by contempt.

Article XII, § 1(b) shall be deleted in its entirety and amended so that section reads "The election shall be conducted by means of a standard type of election mechanical device only."

Article XII, § 1(c) shall be amended so that all references to "local election committee member(s)" be replaced by "Election Officer." Article XII, § 1(c) shall further be amended in accordance with amended Article XII, § 1(b).

Article XII, § 1(e) shall be amended to that reference to "member of the Local election committee" be replaced by "Election Officer."

Article XII, § 1(f) shall be amended so that reference to "election committee" be replaced by "Election Officer."

Article XII, §§ 2(b)(1) and 2(b)(2) shall be amended so that reference to the "Local Secretary–Treasurer" be replaced by "Election Officer."

Article XII, § 2(b)(4) shall be amended so that reference to "Local Union" be replaced "Election Officer."

Article XII, § 2(b)(6) shall be amended with the following clause added after the last word "by the Election Officer."

Article XII, §§ 3(c)(1), (c)(3), shall be amended so that "Local Secretary–Treasurer" be replaced by "Election Officer."

Reference to "Local Union" shall be replaced by "Election Officer."

Article XII, §§ 3(c)(5), (c)(6) shall be amended so that "Local Union" be replaced by "Election Officer."

Article XII, §§ 3(c)(8) and 3(c)(10) shall be amended to have the phrase "by the Election Officer" added after the last word.

Article XII, § 5 shall be amended so that all ballots are counted by the Election Officer.

Article XII, § 6 shall be amended so that "Secretary–Treasurer of the Local Union" be replaced by "Election Officer."

It is hereby ordered that all other rules are adopted to the extent consistent with this order.

It is hereby ordered that all subordinate entities of the International Brotherhood of Teamsters, including all locals, joint conferences, and area conferences, are hereby bound by these election rules, effective immediately.

It is further ordered that these rules shall be enforceable upon pain of contempt.

So Ordered.