**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO; Commission of La Cosa Nostra; Anthony Salerno, also known as Fat Tony; Matthew Ianniello,**

also known as Matty the Horse; Anthony Provenzano, also known as Tony Pro; Nunzio Provenzano, also known as Nunzi Pro; Anthony Corallo, also known as Tony Ducks; Salvatore Santoro; Christopher Furnari, Sr., also known as Christie Tick; Frank Manzo; Carmine Persico, also known as The Snake, also known as Junior; Gennaro Langella, also known as Gerry Lang; Philip Rastelli, also known as Rusty; Nicholas Marangello, also known as Nicky Glasses; Joseph Massino, also known as Joey Messino; Anthony Ficarotta, also known as Figgy; Eugene Boffa, Sr.; Francis Sheeran; Milton Rockman, also known as Maishe; John Tronolone, also known as Peanuts; Joseph John Aiuppa, also known as Joey Aiuppa, also known as Joe Doves, also known as Joey O'Brien; John Phillip Cerone, also known as Jackie Cerone, also known as Jackie the Lackie; Joseph Lombardo, also known as Joey the Clown; Angelo LaPietra, also known as The Nutcracker; Frank Balistrieri, also known as Carl Angelo Deluna, also known as Toughy; Carl Civella, also known as Corky; Anthony Thomas Civella, also known as Tony Ripe; General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Jackie Presser, General President; Weldon Mathis, General Secretary–Treasurer; Joseph Trerotola, also known as Joe T, First Vice President; Robert Holmes, Sr., Second Vice President; William J. McCarthy, Third Vice President; Joseph W. Morgan, Fourth Vice President; Edward M. Lawson, Fifth Vice President; Arnold Weinmeister, Sixth Vice President; John H. Cleveland, Seventh Vice President; Maurice R. Schurr, Eighth Vice President; Donald Peters, Ninth Vice President; Walter J. Shea, Tenth Vice President; Harold Friedman, Eleventh Vice President; Jack D. Cox, Twelfth Vice President; Don L. West, Thirteenth Vice President; Michael J.

Riley, Fourteenth Vice President; Theodore Cozza, Fifteenth Vice President; Daniel Ligurotis, Sixteenth Vice President; Salvatore Provenzano, also known as Sammy Pro, Former Vice President, **Defendants.**

In re APPLICATION LXXXVI OF THE INDEPENDENT ADMINISTRATOR.

Leroy ELLIS, Appellee,

v.

ROADWAY EXPRESS, INCORPORATED, Appellant.

No. 1432, Docket 93–6022.

United States Court of Appeals, Second Circuit.

Argued May 21, 1993.

Decided Aug. 30, 1993.

Linda Imes, New York City (Leanore Barth, Adam Mitzner, Richards Spears Kibbe & Orbe, of counsel), for appellant Roadway Exp., Inc.

Ping C. Moy, Asst. U.S. Atty., S.D.N.Y., New York City (Roger S. Hayes, U.S. Atty. and James L. Cott, Asst. U.S. Atty., of counsel), for plaintiff-appellee U.S.

Paul Alan Levy, Public Citizen Litigation Group, Washington, DC, for appellee Leroy Ellis.

Before: VAN GRAAFEILAND, CARDAMONE and McLAUGHLIN, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Roadway Express, Inc. ("Roadway") appeals from the February 2, 1993 judgment of the United States District Court for the Southern District of New York (Edelstein, J.) and the opinion and order incorporated therein, which invalidated the 1991 discharge of a Roadway employee named Leroy Ellis and directed payment of $18,409.51 to Ellis as back wages and benefits. For the reasons set forth in subdivision A, *infra*, the panel unanimously reverses. In subdivision B, Judge Van Graafeiland, writing only for himself, sets forth additional grounds for reversal based on his belief that the procedure followed in the instant case violated appellant's right to due process.

### A

On June 28, 1988, the United States brought a civil RICO action against the International Brotherhood of Teamsters ("IBT" or the "Union") and some of its officers. The purpose of the suit, as repeatedly proclaimed by the district court, was to rid IBT of "the hideous influence of organized crime." Settlement negotiations were conducted and re-

sulted eventually in a Consent Decree aimed primarily at ensuring that the Union's 1991 general election would be conducted in a fair, honest and open manner. "The remedial provisions in the Consent Decree provided for three Court-appointed officials, the Independent Administrator to oversee its provisions, an Investigations Officer to bring charges against corrupt IBT members, and an Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the 'Court Officers')." *United States v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 742 F.Supp. 94, 97 (S.D.N.Y.1990), *modified*, 931 F.2d 177 (2d Cir.1991).[1] The Consent Decree, dated March 14, 1989, "[was] to run for a period of three years, ceasing after the IBT's 1991 elections for International Officers." 728 F.Supp. 1032, 1045.

The 1991 general election was conducted as scheduled in December 1991, and the results were certified by the Election Officer on January 22, 1992. Thereafter, on June 16, 1992, the Election Officer, responding to an election protest filed by Leroy Ellis on September 20, 1991, held that Ellis, a successful electoral candidate for union vice-president, had been discharged wrongfully on September 19, 1991. We hold that the Election Officer's authority to make this decision had expired with his certification of the 1991 election results in January.

> Under § B(3)(3) of the Consent Decree, after the certification of the 1991 election by the Elections Officer, the authority of these three court officers ceases and their functions are taken over by the [Independent Review Board]. On January 22, 1992, the Elections Officer certified the 1991 election, triggering the [Independent Review Board] phase of the Consent Decree.

998 F.2d 1101, 1105 (2d Cir.1993).

> By the terms of the Consent Decree, the authority of the Elections Officer and the Independent Administrator terminates upon certification of the 1991 IBT election

---

1. Hereafter all citations to the decisions of this court and the District Court for the Southern District of New York in the *United States v. IBT* litigation will refer simply to volume and page number.

results, except for prompt investigation of certain post-election claims of election irregularity.

964 F.2d 180, 183.

The certification of the election results marks a point of transition in the Consent Decree. The termination of the Court–Appointed Officers' authority is related to this event....

803 F.Supp. 761, 768.

We reject appellees' argument that the Election Officer's authority had not expired, which is based on their contention that because the Election Officer did not determine Ellis' pre-election protest within five days after he received it, as required by Article XI, 1a(4)(a) of the Election Rules, he was entitled under Article XI, 1a(4)(b) of the Rules to defer his ruling and treat the protest as a post-election protest, as if it had been filed on election day. Article XI, 1b(2) provides that "[p]ost-election protests shall only be considered and remedied if the alleged violation may have affected the outcome of the election." Because Ellis was elected to the vice-presidency to which he aspired, the alleged impropriety in his discharge cannot be said to have affected the election's outcome.

Needless to say, if, as we hold, the Election Officer acted without authority in handing down his June 16, 1992 decision, the Independent Administrator's purported affirmance of this decision was equally invalid. The district court, therefore, erred in affirming the decision of the Independent Administrator, and the judgment appealed from must be reversed.

B

Upon reading the Independent Administrator designee's statement in his discussion of "PROCEDURAL SAFEGUARDS," that neither his actions nor those of the Election Officer are circumscribed by the due process provisions of the Federal Constitution, my reaction as a judge was one of instinctive disbelief. In the paragraphs that follow, I will explain why I believe my reaction was justified and why the disregard of due process requirements herein constitutes an additional reason for reversal.

Roadway is not La Cosa Nostra, the stated target of the government's RICO action and the Consent Decree. It is a large interstate trucking concern, a wholly owned subsidiary of Roadway Services, Inc., a publicly traded company with over 6,000 shareholders. According to Moody's 1992 Transportation Manual, Roadway owns approximately 40,000 trucks, tractors and trailers. Pursuant to the terms of its collective bargaining agreement with IBT, Roadway has the right to discharge its employee-drivers for cause. This is a property interest protected by the Fifth Amendment. *See Brock v. Roadway Express, Inc.*, 481 U.S. 252, 260–61, 107 S.Ct. 1740, 1746–47, 95 L.Ed.2d 239 (1987).

On the night of September 18, 1991, Ellis, a Roadway driver, went to a Burlington Northern rail yard in Cicero, Illinois to drop off one trailer and pick up another. At about 1:45 a.m., while Robert Stein, a Burlington Northern Terminal Manager, was leaving the terminal facility in his car, he observed the Roadway trailer parked in the terminal yard with the driver apparently asleep in the cab. Because trucks were not supposed to be parked in the yard, Stein called the Assistant Terminal Manager on his car phone and instructed him to inform Roadway of what Stein had seen. Roadway's Driver Supervisor, with whom the Assistant Terminal Manager talked, identified the driver as Ellis and opined that Ellis probably was on his lunch break and would be leaving the yard shortly. However, at approximately 3:15 a.m., Stein observed the trailer parked in the same spot with the driver apparently still asleep. A Burlington Northern security guard then was instructed to investigate the matter. The guard woke Ellis and directed him to leave. Despite Ellis' denial that he had been asleep, Roadway discharged him. The Government and the Independent Administrator contend that Ellis was fired because of his campaign activities in the pending election. The logic of this argument is questionable at best.

The Consent Decree directed that the 1991 election be conducted in three stages: "first, at the local union level, the election of dele-

gates to the international convention; second, at the convention itself, the election of nominees by the delegates; and third, across the international union's entire territory, the one-member, one-vote election of the officers from among the nominees selected at the convention." 899 F.2d 143, 144–45. The government's action was aimed at union reform. By March 1991, sufficient delegates pledged to the candidacy of Ron Carey, a reform candidate, had been elected in the first stage of the election process to ensure that he and the members of his slate would be nominated at the second stage convention to be held in June. Carey was one of three presidential candidates nominated. Moreover, as the date of the general election drew closer, it became apparent that the Carey slate was gaining strength. The Carey candidates were the good guys, the reformers, the seekers-after-democracy, and Ellis, as a candidate for vice-president, was a member of that team. Ellis was a former world-ranked heavyweight contender and a man not to be trifled with. See Kenneth C. Crowe, Collision: How the Rank and File Took Back the Teamsters 191 (1993). If elected to the office of vice-president, Ellis would terminate his employment at Roadway and assume a full-time position of authority in the Union. Under these circumstances, one understandably might wonder why, only three months before Ellis' election, Roadway, a legitimate business entity, would conspire with Burlington Northern Railroad, another legitimate business entity, to fire him.

Ellis filed grievances with a union-management grievance committee, as provided for in Roadway's collective bargaining agreement, and also with the NLRB and the Election Officer. Following a hearing at which Ellis testified, the union-management committee denied his grievance. The NLRB Regional Director, after "carefully investigat[ing] and consider[ing]" the case, rejected Ellis' contention that he was discharged because of his union activities, and accepted "the reasons advanced by the Employer at the time of your discharge," i.e., a gross abuse of company time. The Regional Director therefore refused to issue a complaint. The Election Officer, however, concluded that Roadway discharged Ellis because of his union activi-

ties as a candidate for union vice-president. This decision was affirmed by the Independent Administrator, whose decision was affirmed in turn by the district court. The merit of this decision was questionable. More importantly, the manner in which it was arrived at violated established legal principles of fair play and due process.

As above stated, the United States commenced the above-captioned action pursuant to the civil remedies provision of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1964. Insofar as the government is concerned, section 1964 is the civil counterpart of 18 U.S.C. § 1963, criminal RICO. "Section 1962 renders certain conduct 'unlawful'; § 1963 and § 1964 impose consequences, criminal and civil, for 'violations' of § 1962." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 489, 105 S.Ct. 3275, 3281, 87 L.Ed.2d 346 (1985). Section 1964 permits suit to be brought by either the government or an injured party. However, while an injured person may receive "threefold the damages he sustains," (§ 1964(c)), in cases such as the instant one, the government sues in its sovereign capacity pursuant to a "compelling governmental interest" and "strong congressional policy." Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, 965 F.2d 1224, 1238, 1236 (2d Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 406, 121 L.Ed.2d 331 (1992); see United States v. Bonanno Organized Crime Family, 879 F.2d 20, 21–27 (2d Cir.1989).

It was in furtherance of that compelling governmental interest and strong congressional policy that the district court adopted the Consent Decree and has proceeded since to enforce it. See United States v. American Cyanamid Co., 719 F.2d 558, 564 (2d Cir. 1983), cert. denied, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984). It was in furtherance of that interest and policy that the government in case after case has pressed for enforcement of the Decree which it had secured, as, in fact, it is doing in the instant case. It was in furtherance of that same interest and policy that the district court, urged on by the government, has utilized the provisions of the All Writs Act, 28 U.S.C.

§ 1651, to make the Consent Decree enforceable as against Roadway.

While acknowledging that the Consent Decree could not bind those who were not parties to the settlement, *see* 931 F.2d 177, 185 (citing *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989)), we have recognized that the district court could enlist the services of the Election Officer and the Independent Administrator, as "Court Officers", to aid it in the exercise of its jurisdiction under the All Writs Act. Despite this recognition, however, we twice have said that these "Court Officers" were not state actors in the constitutional sense. *See* 941 F.2d at 1296 and 954 F.2d at 806–07. For several reasons, I believe that these statements should not control our decision in the instant case.

The first case, 941 F.2d 1292, involved only the internal disciplining of union members by the Court Officers, who were exercising intra-union powers delegated to them by the union's constitution as amended, not exercising authority over an employer who was not a party to the Consent Decree. Moreover, our statement concerning the Court Officers' status as state actors was essentially dictum, since we proceeded to hold that the plaintiffs' constitutional claims were "entirely without merit." 941 F.2d at 1297.

The second case, 954 F.2d 801, unlike the first one, involved a non-party employer. However, the panel adopted the reasoning of the panel in the first case in holding that the Court Officers were not state actors:

"[G]overnmental oversight of a private institution does not convert the institution's decisions into those of the State, as long as the decision in question is based on the institution's independent assessment of its own policies and needs. The same reasoning applies equally in this case."

954 F.2d at 807 (quoting 941 F.2d at 1297).

Rather than asserting that the second panel erred in relying, as did the first panel, on the union's "independent assessment of its own policies and needs," I would treat this

reasoning as inapplicable dictum and look to the panel's actual holding which was:

[W]e do not think that [appellant] suffered from the deprivation of due process safeguards.

.    .    .    .    .

Furthermore, [appellant's] claim that it was denied procedural due process is belied by the record.

.    .    .    .    .

[B]y failing to seek a stay or reversal in the district court, [appellant] waived any due process objections that it had. . . .

*Id.*

Whether a person's conduct constitutes state action must be determined on a case-by-case basis by "sifting facts and weighing circumstances." *See Evans v. Newton,* 382 U.S. 296, 299–300, 86 S.Ct. 486, 488–489, 15 L.Ed.2d 373 (1966); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961); *Newsom v. Vanderbilt Univ.,* 653 F.2d 1100, 1113 (6th Cir.1981). Deciding this case on the facts presently before us, I would hold that the conduct of the Court Officers vis-a-vis Roadway constituted state action on the basis that the district court endowed the Officers with "powers or functions governmental in nature." *Evans v. Newton, supra,* 382 U.S. at 299, 86 S.Ct. at 488; *see Shelley v. Kraemer,* 334 U.S. 1, 14–15, 68 S.Ct. 836, 842–43, 92 L.Ed. 1161 (1948); *Nixon v. Condon,* 286 U.S. 73, 88, 52 S.Ct. 484, 487, 76 L.Ed. 984 (1932); *Brinkerhoff–Faris Trust & Sav. Co. v. Hill,* 281 U.S. 673, 682, 50 S.Ct. 451, 454–55, 74 L.Ed. 1107 (1930). Indeed, the Court Officers could not have presumed to exercise the powers they did if they were not acting "under color of law," an often used synonym for "state action." *See United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1156–57, 16 L.Ed.2d 267 (1966); *Screws v. United States,* 325 U.S. 91, 107–08, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).[2] However, the issue of state action is not the sole determinative factor in the instant case.

**2.** We note that the Election Officer summarized his report under the heading "CONCLUSIONS OF LAW," an unusual expression for a lay person to use.

The All Writs Act specifically requires that the district court provide non-parties such as Roadway with procedures that are "agreeable to the usages and principles of law." One established principle of law is that no person shall be deprived of his liberty or property without a fair hearing. *See Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

> The principle, that no man shall be deprived of his liberty or property, except by the "law of the land," or its synonym, "due process of law," is older than written constitutions, older even than Runnymede; and breathes so palpably the spirit of exact justice, that it needs no formulation in the organic law. This principle is, however, in one form of expression or another, incorporated into the Federal Constitution, as well as those of the several States.

*Quimby v. Hazen,* 54 Vt. 132, 138 (1881).

Moreover, the Consent Decree itself mandated that the hearing before the Independent Administrator should be "fair and impartial," and a judicial decree can be enforced against a non-party pursuant to the All Writs Act only "if appropriate procedures are followed and applicable substantive law is observed." 968 F.2d 1472, 1476. If Roadway did not receive a fair hearing from the Court Officers in the instant case, the proceedings below violated the All Writs Act and Roadway's right to due process. *See* 948 F.2d 98, 104–05.

In determining what constitutes a fair and impartial hearing, I find *Brock v. Roadway Express, Inc., supra,* 481 U.S. 252, 107 S.Ct. 1740, an informative and compelling precedent. In that case, the Court reversed in pertinent part a decision of the Secretary of Labor under section 405 of the Surface Transportation Act of 1982, 49 U.S.C.App. § 2305, because the Labor Department's investigator had refused to provide the employer Roadway with the names of witnesses who assertedly supported the employee's version of events. Writing for a four judge plurality, Justice Marshall said:

> Notice of an employee's complaint of retaliatory discharge and of the relevant supporting evidence would be of little use

if an avenue were not available through which the employer could effectively articulate its response.

*Id.* at 265, 107 S.Ct. at 1749.

Justices Brennan and Stevens would have gone further than the Court plurality, who required only that the witnesses be identified so that the employer could prepare a meaningful response. Both Justices would require that where there are disputed factual questions critical to the issue, the employer should be given an opportunity to cross-examine the unidentified witnesses who oppose its version of the facts. *Id.* at 269–70, 275–78, 107 S.Ct. at 1751–52, 1754–56. The position of these six Justices might appropriately be summed up in Justice Stevens' quote from Justice Frankfurter's concurring opinion in *Joint Anti–Fascist Refugee Comm. v. McGrath, supra,* 341 U.S. at 171, 71 S.Ct. at 648–49: " 'Secrecy is not congenial to truthseeking.' " 481 U.S. at 277, 107 S.Ct. at 1756. With this brief review of the law as background, I now summarize what happened in the instant case.

When Roadway was informed by the Election Officer on September 20, 1991 that Ellis had filed an election protest, Roadway promptly challenged the Election Officer's jurisdiction. However, from time to time thereafter, Roadway furnished factual information as requested by the Regional Coordinator assigned by the Election Officer to investigate the matter. On March 18, 1992, six months after the election protest was filed, Roadway was informed by a member of the Regional Coordinator's staff that she had testimony from a Roadway management employee that at several staff meetings in June 1991 Roadway's relay manager, Mike Lamphere, had expressed his opposition to the Carey slate of candidates and had instructed his subordinates to put disciplinary pressure on Ellis. The Regional Coordinator refused to identify the employee who furnished this information, which Lamphere denied in a sworn affidavit. Both Ellis and the Government concede in this court that witness identification was in fact denied. The gross prejudice to Roadway resulting from this denial is glaringly apparent in the report of the Election Officer.

The Election Officer made the following factual findings concerning the unidentified witness, upon whose testimony the Election Officer placed "particular emphasis":

1. The witness retired from Roadway on October 25, 1991 with a disability pension.

2. The witness has a brain tumor, and his condition is terminal.

3. The witness has no motivation for lying.

4. The witness "is no longer employed by Roadway and will not seek reemployment by that or any other company. Given his present physical condition, he can have no expectation for obtaining employment or other patronage opportunity from Mr. Ellis or the present administration of the IBT."

5. "Given his present terminal condition, the Election Officer finds that his only motivation is the one he gives—wanting to come forward with the truth before he dies."

Had Roadway been informed of the identity of this unknown witness, it could have proven that the Election Officer's findings were without basis in fact, indeed were based on outright falsehoods. This proof would have shown that:

1. The witness did not resign from Roadway on October 25, 1991 with a disability pension. He was fired on April 24, 1992 because of chronic unexplained absences.

2. The witness did not have a fatal brain tumor, and his condition was not terminal. A November 5, 1991 MRI scan of the witness's brain disclosed no abnormalities whatever, the condition of the witness's brain being described as "normal."

3. The witness had been at loggerheads with Roadway for some time prior to the Election Officer's decision. On March 21, 1992, the witness filed a charge with the Illinois Department of Human Rights and the EEOC in which he stated, among other things:

I was discriminated against and continue to be discriminated against by the above named employer, Roadway Express ("Roadway"), and by my supervisor Michael Lamphere ("Lamphere"), in that:

1. Since February 10, 1992, Lamphere has repeatedly refused to permit me to return to work, despite the fact that I have supplied a detailed medical release from my attending physician, for no other reason than that I am the only African–American supervisor who has protested racially discriminatory policies at Roadway.

\* \* \* \* \* \*

For all these reasons, Roadway and Lamphere refused to permit me to return to work and refused to provide any meaningful promotion opportunity for me or for any other African–American or other minority at Roadway.

(This charge appears to be still pending.)

4. If, as the witness swore in his EEOC challenge, he was medically fit to return to work at Roadway, his physical condition obviously did not preclude any expectation of employment elsewhere.

5. The witness's asserted desire to come forward with the truth before he dies was an absurd falsehood.

If the Election Officer's above findings were true, there would have been no reason to conceal the witness's identity from Roadway. Certainly the witness would have had no reason to fear retaliation. One does not retaliate against a dying man who has no interest in seeking employment. The fact of the matter is that the witness was not a dying man who harbored no grudge or vindictive feelings against Roadway.

Unfortunately, Roadway was not informed of the identity of this witness in whom the Election Officer placed such credence until the evening of the day preceding the hearing before the Independent Administrator. In the Election Officer's Summary, a copy of which Roadway received on the evening of June 23, 1992, the unidentified witness was identified for the first time as one Wayne Johnson. Recognizing that the dispute involved "credibility questions that are not easy to resolve," the Election Officer stated in the Summary:

Finally, Mr. Ellis has the benefit of unusually strong corroborating evidence as to his claim that the real motive was Roadway's hostility toward his political activity on behalf of the Ron Carey slate and campaign. The testimony of former supervisor Wayne Johnson is compelling in this regard.

\* \* \* \* \* \*

The Election Officer credits Mr. Johnson's statements over the management representatives who contradict them.

It was doubly unfortunate from Roadway's standpoint that the Independent Administrator hearing was not conducted before former United States District Judge Frederick Lacey, the court-appointed Administrator, but was conducted by Judge Lacey's "designee." As I have already noted, the designee commenced his consideration of the matter with the statement that his actions were not "circumscribed" by the due process provisions of the Constitution. This, of course, made it easy for him to refuse to grant Roadway's request that it be given an opportunity to submit written proof of Johnson's lack of credibility. Completely disregarding the Election Officer's established practice of not disclosing the names of witnesses, the designee stated that Roadway was derelict in not challenging Johnson's credibility at an earlier date. The designee then proceeded to accept the Election Officer's flawed determination of Mr. Johnson's credibility.

The designee also accepted the Election Officer's equally flawed assertion that, because Mr. Lamphere, the terminal manager at the Chicago Heights Roadway facility, had once been an assistant to a management employee at the Burlington Northern Railroad's Cicero yard, an employee who played no role whatever in the events concerning Ellis, a "confidential relationship" existed between Roadway's facility and the Railroad's facility. This demonstrated a misunderstanding of what in law constitutes a confidential relationship. "A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind." 1 Austin Scott, *The Law of Trusts* 39 (3d ed. 1967); *see Wilson–Rich v.*

*Don Aux Assoc., Inc.*, 524 F.Supp. 1226, 1232 (S.D.N.Y.1981). There is absolutely no evidence of such a relationship in the instant case. Based upon this asserted "confidential relationship", the designee made the wispy finding that Roadway had persuaded Burlington Northern to join with Roadway to "set up" Ellis by letting him sleep. I doubt very much that Judge Lacey would have applied this distorted interpretation of the law.

The district court, which customarily has accorded great deference to the Independent Administrator in upholding his decisions, has affirmed the Independent Administrator's decision in the instant case. Because I am satisfied that Roadway did not receive from the Election Officer and the Independent Administrator the fundamental fairness and fair play to which it was entitled, I would hold that the district court erred in affirming.

The reader perhaps may wonder why, since we have unanimously voted to reverse, the writer has invested the time and effort necessary to write additionally on his own. The answer can be found in the establishment pursuant to the Consent Decree of an Independent Review Board to take over the functions of the three officers whose authority terminated with the certification of the 1991 election. *See* 998 F.2d at 1105. It is reasonable to expect that the Independent Review Board will be issuing orders in the future. When these orders affect the rights of any person not a party to the Consent Decree, I would hope that this court would require that the rights of that person be given due process protection. *See Brock, supra*, 481 U.S. at 258, 107 S.Ct. at 1745. Exercising expanded jurisdiction under the All Writs Act is one thing. Accomplishing this result by the appointment of lay people who operate without regard to due process restrictions is another.

The judgment of the district court is reversed.